## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

ESTATE OF IBRAGIM TODASHEV, by
HASSAN SHIBLY, as Personal Representative
of the ESTATE OF IBRAGIM TODASHEV,
and for the Survivors, ABDULBAKI
TODASHEVE, Father, and ZULLA
TODASHEVA, Mother.

            Plaintiff,

v.                                      CASE NO. 6:17-cv-0919-CEM-DCI

UNITED STATES OF AMERICA and
AARON McFARLANE, CHRISTOPHER
JOHN SAVARD, CURTIS CINELLI, and
JOEL GAGNE, individually,

            Defendants.
_____/

## INDIVIDUAL FEDERAL DEFENDANT AARON McFARLANE'S
## MOTION FOR PRE-DISCOVERY SUMMARY JUDGMENT

      Individual Federal Defendant Aaron McFarlane, through the undersigned counsel

and pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby moves for pre-

discovery summary judgment in his favor, and in support thereof, submits the following.[1]

### SYNOPSIS

      Plaintiff alleges that Federal Bureau of Investigation Special Agent Aaron

McFarlane used excessive force in violation of the Fourth Amendment when he shot and

killed the decedent, Ibragim Todashev, on May 22, 2013. The incontrovertible evidence

shows that just prior to the shooting, Todashev violently attacked SA McFarlane with a

---

[1] Retired-Task Force Officer Christopher Savard has separately moved to dismiss all counts against him. However, should this Court grant the instant motion and conclude that based on the undisputed facts the use of force against Todashev did not violate a clearly established constitutional right, that finding would end the case against TFO Savard as well.

table, causing a huge gash on SA McFarlane's head that bled profusely onto his clothes and required nine staples to his skull to close the wound. After attacking SA McFarlane once, Todashev then ran into the kitchen, appeared to be looking for something, and re-emerged only to advance aggressively on the officers again, this time with a weapon, a red pole. Based on these facts, there can be no genuine dispute that SA McFarlane's use of deadly force in response to Todashev's violent attack was objectively reasonable under the Fourth Amendment. Plaintiff certainly cannot show a clearly established constitutional violation. SA McFarlane is therefore entitled to qualified immunity.

## UNDISPUTED FACTS

1.      The movant is Individual Federal Defendant Aaron McFarlane, Special Agent (SA) for the Federal Bureau of Investigation (FBI). Plaintiff is Hassan Shibly, as Personal Representative of the Estate of Ibragim Todashev and for his surviving parents, Abdulbaki Todasheve and Zulla Todasheva. Sec. Am. Compl. (SAC) ¶¶ 4-5.

2.      The incident giving rise to this suit occurred on May 22, 2013. SAC ¶ 9; 05/28/2013 Sworn Statement of Aaron McFarlane (McFarlane Stmnt.), at 1 (**Ex. 1**); 05/29/2013 Sworn Statement of Curtis Cinelli (Cinelli Stmnt.), at 1 (**Ex. 2**); 02/02/2018 Declaration of Heather Butters (Butters Decl.) ¶¶ 6.a-b (**Ex. 4**) (identifying Exhibits 1 and 2).[2] At that time, SA McFarlane was acting within the scope of his employment as a federal law enforcement officer. SAC ¶ 122; McFarlane Stmnt., at 2 (**Ex. 1**).

3.      Ibragim Todashev was of interest to the FBI because of his association with Tamerlan Tsarnaev, one of the Boston Marathon bombers. Both men were also

---

[2] The sworn statements of SA McFarlane and Massachusetts State Trooper Curtis Cinelli were made in the course of the FBI's use-of-force investigation into the underlying shooting incident. A number of exhibits have been redacted for security and privacy reasons. A list of deletion codes are included with Exhibit 1.

suspects in a triple homicide that occurred in Waltham, Massachusetts. SAC ¶¶ 27, 29, 70 (alleging that Tsarnaev participated in the Boston Marathon bombing and was a suspect in the Waltham triple homicide); McFarlane Stmnt., at 2 (**Ex. 1**) (stating that Todashev was also a suspect in the Waltham triple homicide); Cinelli Stmnt., at 1 (**Ex. 2**) (same).

4.     At the time of the events giving rise to this lawsuit, Todashev was living in Orlando, Florida, but planned to return to Russia on May 24, 2013. SAC ¶ 67; McFarlane Stmnt., at 3 (**Ex. 1**); Cinelli Stmnt., at 2 (**Ex. 2**).

5.     On May 21, 2013, Task Force Officer (TFO) Christopher Savard of the Orlando Police Department contacted Todashev to arrange a meeting with him, SA McFarlane and Massachusetts State Troopers Curtis Cinelli and Joel Gagne. Todashev refused to meet at the police station, but consented to the officers entering his apartment and conducting the interview there. SAC ¶¶ 68-69, 72 (alleging that TFO Savard contacted Todashev and that the interview was set at Todashev's apartment); McFarlane Stmnt., at 3-4 (**Ex. 1**); Cinelli Stmnt., at 2 (**Ex. 2**).

6.     Prior to the meeting, SA McFarlane was aware that Todashev had trained in Mixed Martial Arts and wrestling; had been arrested during a road rage incident in Boston; and had recently been arrested after a fight in Orlando during which Todashev fought off two individuals, knocking one unconscious and causing that man to lose several teeth. SAC ¶ 28 (Todashev trained in martial arts); McFarlane Stmnt., at 2-3 (**Ex. 1**); Cinelli Stmnt., at 2 (**Ex. 2**); 05/23/2013 Ibragim Todashev National Crime Information Center (NCIC) Report, at 1, 3, 5 (**Ex. 3**) (confirming Todashev's martial arts training as well as his arrest history for disorderly conduct, resisting arrest, driving to endanger, and aggravated battery); Butters Decl. ¶ 6.c (**Ex. 4**) (identifying Exhibit 3).

7.      Based on Todashev's criminal history and background (researched prior to the meeting), SA McFarlane assessed Todashev's inclination and ability for physical violence at an "eight" on a scale of one to 10; Trooper Cinelli also believed Todashev to be a dangerous individual. McFarlane Stmnt., at 3 (**Ex. 1**); Cinelli Stmnt., at 2 (**Ex. 2**).

8.      During the interview, which began at approximately 7:30 p.m., SA McFarlane and Troopers Cinelli and Gagne questioned Todashev about the Waltham murders. As the questioning focused on Todashev's presence in Boston during the time of the murders, his demeanor changed. SA McFarlane believed Todashev's stress level was very high and the possibility for him to react in a physical way increased. McFarlane Stmnt., at 4-5 (**Ex. 1**); Cinelli Stmnt., at 3 (**Ex. 2**).

9.      Todashev began acknowledging some involvement in the murders and eventually started writing a statement in a notebook regarding his involvement. McFarlane Stmnt., at 6 (**Ex. 1**); Cinelli Stmnt., at 3 (**Ex. 2**). Latent fingerprint and palm print examinations conducted by the FBI confirm that six latent fingerprints and one latent palm print on a notebook containing a partial confession belonged to Todashev. Photograph of Partial Confession (**Ex. 5**); 11/13/2013 Report of Examination (**Ex. 6**); Butters Decl. ¶¶ 7.d, 6.d (**Ex. 4**) (identifying Exhibits 5 and 6).

10.     While Todashev was writing his statement, Trooper Gagne stepped outside to call the District Attorney. McFarlane Stmnt., at 6 (**Ex. 1**); Cinelli Stmnt., at 3 (**Ex. 2**). Todashev then asked to use the restroom for the third or fourth time, but his movements were noticeably slow, almost methodical. SA McFarlane had a heightened sense of awareness for his and Trooper Cinelli's safety. McFarlane Stmnt., at 6 (**Ex. 1**); Cinelli Stmnt., at 3 (**Ex. 2**).

11.     Trooper Cinelli became more concerned that Todashev might flee or attack them. Cinelli Stmnt., at 3 (**Ex. 2**). Trooper Cinelli's concern was sufficient enough that he hid a sword located in the apartment behind a shoe rack and sent the following text message to SA McFarlane at 12:03 a.m. on May 22, 2013: "Be on guard. He is in vulnerable position to do something bad. Be on guard now. I see him looking around at times." *Id.* at 3-4 (**Ex. 2**). A photograph taken by the FBI Emergency Response Team (ERT) shortly after the shooting confirms that Todashev's sword was hidden behind a shoe rack, and a photograph of Trooper Cinelli's cell phone confirms the date, time, and wording of his text message to SA McFarlane. Photograph of Sword (**Ex. 7**); Photograph of Text Message (**Ex. 8**); Butters Decl. ¶¶ 7.c, 8.a (**Ex. 4**) (identifying Exhibits 7 and 8).

12.     Just after Trooper Cinelli sent his text, Todashev violently threw a white table at SA McFarlane, causing a serious head wound. McFarlane Stmnt., at 7-8 (**Ex. 1**); Cinelli Stmnt., at 4-5 (**Ex. 2**). A photograph taken by FBI ERT shortly after the shooting confirms that a white table had been flipped upside down in the apartment. Photograph of Flipped White Table (**Ex. 9**); Butters Decl. ¶¶ 7.a (**Ex. 4**) (identifying Exhibit 9). And photographs taken of SA McFarlane that night at the hospital confirm the significant head wound that bled profusely all over his clothes and required nine staples to his skull to close to wound. Photographs of Wound and Bloody Shirt (**Ex. 10**); 02/01/2018 Declaration of John B. Geeslin ¶ 4 (**Ex. 17**) (identifying Exhibit 10).

13.     DNA examinations conducted by the FBI confirm that the blood located on SA McFarlane's clothes, as well as the blood on the white table and the shelf from the white table belonged to SA McFarlane, not Todashev. 09/18/2013 Report of Examination (excluding Todashev as blood source) (**Ex. 11**); 10/28/2013 Report of Examination

(confirming SA McFarlane as blood source) (**Ex. 12**); Butters Decl. ¶¶ 6.e-f (**Ex. 4**) (identifying Exhibits 11 and 12).

14.     After throwing the table, Todashev ran into the kitchen, apparently looking for something, and ignored repeated commands by SA McFarlane to "show me your hands." McFarlane Stmnt., at 7 (**Ex. 1**); Cinelli Stmnt., at 4 (**Ex. 2**). SA McFarlane believed Todashev was looking for a weapon because he could hear the sound of metal banging together, like knives, and he further believed that Todashev was successful in obtaining some kind of weapon. McFarlane Stmnt., at 7 (**Ex. 1**).

15.     Trooper Cinelli observed Todashev advancing back towards the officers holding a five-foot long red pole and standing in what appeared to be a trained fighting position. Cinelli Stmnt., at 4 (**Ex. 2**). SA McFarlane observed Todashev standing in an attacking posture. McFarlane Stmnt., at 8 (**Ex. 1**).

16.     Todashev ran at full speed towards Trooper Cinelli and SA McFarlane. McFarlane Stmnt., at 8 (**Ex. 1**); Cinelli Stmnt., at 4 (**Ex. 2**). In order to stop this threat, SA McFarlane fired three or four times and Todashev fell downwards. McFarlane Stmnt., at 8 (**Ex. 1**); Cinelli Stmnt., at 4 (**Ex. 2**). Seconds later, Todashev re-established his footing into a fighting stance and lunged again. McFarlane Stmnt., at 8 (**Ex. 1**); Cinelli Stmnt., at 4-5 (**Ex. 2**). In order to stop this threat, SA McFarlane fired three or four more times. McFarlane Stmnt., at 8 (**Ex. 1**); Cinelli Stmnt., at 5 (**Ex. 2**).

17.     Todashev fell to the ground face first, away from the front door to the apartment. McFarlane Stmnt., at 8 (**Ex. 1**); Cinelli Stmnt., at 5 (**Ex. 2**). A photograph taken by FBI ERT shortly after the shooting confirms that Todashev landed face first, away from the front door of the apartment, and further confirms that a red pole was lying

underneath his body. Photograph of Todashev and Red Pole (**Ex. 13**); Butters Decl. ¶ 7.b (**Ex. 4**) (identifying Exhibit 13).

18.      At the time of the shooting, SA McFarlane and Trooper Cinelli were in fear for their lives and believed Todashev intended to kill them. McFarlane Stmnt., at 8 (**Ex. 1**); Cinelli Stmnt., at 5 (**Ex. 2**).

19.      On May 22, 2013, at 12:05 a.m., TFO Savard used his police radio to summons emergency medical services – only two minutes after Trooper Cinelli had sent his text message to SA McFarlane to be on guard. 01/30/2018 Transcript of 05/22/2013 911 Call (**Ex. 14**); Butters Decl. ¶ 9 (**Ex. 4**) (identifying Exhibit 14).

20.      Firearms examinations confirm that all seven bullets and all seven shell casings recovered from the scene were fired from the same barrel of a .40 S&W caliber Glock pistol, Model 23, Serial Number NMS622. 07/07/2013 Report of Examination (identifying six bullets and seven shell casings) (**Ex. 15**); 09/30/2013 Supplemental Report of Examination (identifying seventh bullet) (**Ex. 16**); Butters Decl. ¶¶ 6.g-h (**Ex. 4**) (identifying Exhibits 15 and 16).

## <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.* In applying this standard, the court reviews all evidence in the light most favorable to the nonmoving party. *City & Cnty. of*

*San Francisco v. Sheehan*, 135 S. Ct. 1765, 1769 (2015). The court must not weigh the evidence nor attempt to determine the truth; instead, it must limit its inquiry to whether genuine issues of triable fact exist. *Anderson*, 477 U.S. at 249. If the party who has the burden of proof at trial fails to establish even one essential element of the case, "there can be no genuine issue as to any material fact" because the failure to establish a single element "renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party may not rely solely on "conclusory allegations without specific supporting facts." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). Finally, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted).

## QUALIFIED IMMUNITY STANDARD

The defense of qualified immunity "protects government officials performing discretionary functions . . . from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996). Once an officer shows he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is improper. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). To satisfy that burden, the plaintiff must cite facts indicating (1) the violation of a constitutional right; and (2) that the right was clearly established at the time of the alleged violation. *Morris v. Town of Lexington*, 748 F.3d 1316, 1322 (11th Cir. 2014). A court may resolve the qualified immunity question with either prong, at its discretion. *Pearson v. Callahan*,

555 U.S. 223, 236 (2009). Thus, where an issue of material fact exists as to whether a constitutional right was violated under prong one, the court can skip to prong two without requiring discovery if the right was not clearly established at the time. *See id.* at 238-39.

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal quotations and citation omitted); *see also Malley v. Briggs*, 475 U. S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"). "In the qualified immunity analysis, [courts] generally compare the acts of each defendant to analogous case law to determine whether each defendant has violated a clearly established constitutional right." *Corey Airport Servs., Inc. v. Decosta*, 587 F.3d 1280, 1288 n.6 (11th Cir. 2009). The standard "do[es] not require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741 (citations omitted).

"Such specificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotations and citation omitted). "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *al-Kidd*, 563 U.S. at 742; *Sheehan*, 135 S. Ct. at 1776 ("Qualified immunity is no immunity at all if 'clearly established' law can simply be

defined as the right to be free from unreasonable searches and seizures."). Thus, in the Fourth Amendment context, to deny a motion based on qualified immunity, a court must "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White v. Pauley*, 137 S. Ct. 548, 552 (2017). The Court has referred to this standard as an "exacting standard." *Sheehan*, 135 S. Ct. at 1776.

In the deadly force context, the Eleventh Circuit has held that "[an] officer is entitled to qualified immunity unless *every reasonable officer* in his position inevitably would conclude that deadly force was unnecessary and thus unlawful under the circumstances." *Santana v. Miami-Dade Cty.*, 688 F. App'x 763, 770 (11th Cir. 2017) (internal quotations and citation omitted) (emphasis added). Moreover, only binding precedent creates clearly established law. *See Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc). Finally, "[a]t the summary judgment stage . . . once [the court has] determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, the reasonableness of [an officer]'s actions . . . is a pure question of law." *Scott*, 550 U.S. at 381 n.8.

## PRE-DISCOVERY MOTIONS AND QUALIFIED IMMUNITY

"[T]he purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990). The Rule permits a party to file a motion for summary judgment "at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b); *see also Reflectone, Inc. v. Farrand Optical Co.*, 862 F.2d 841, 843-44 (11th Cir. 1989) (noting that Rule 56 expressly permits a party to move for pre-discovery

summary judgment). Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Thus, the Supreme Court has repeatedly emphasized that lower courts must resolve the threshold legal question of qualified immunity *before* subjecting government officials to discovery. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 685 (2009); *Pearson*, 555 U.S. at 231-32; *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996); *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

As the Court explained, "*the driving force* behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved *prior to discovery*." *Pearson*, 555 U.S. at 231-32 (internal quotations and citation omitted) (emphasis added). That protection is lost when officials must participate in discovery bearing on the merits of a claim that ultimately fails to show a violation of clearly established law. *See Redford v. Gwinnett Cty. Jud. Cir.*, 350 F. App'x 341, 346 (11th Cir. 2009) ("Subjecting officials to traditional discovery concerning acts for which they are likely immune would undercut the protection immunity was meant to afford."). Thus, as the Eleventh Circuit has noted, the Supreme Court has cautioned district courts *against* permitting discovery before considering a motion for pre-discovery summary judgment based on qualified immunity. *See Garner v. City of Ozark*, 587 F. App'x 515, 518 (11th Cir. 2014) (citing *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987)). To that end, the Eleventh Circuit has held that where a plaintiff seeks discovery in response to such a motion, the "balancing is done with a thumb on the side of the scale weighing *against* discovery." *Id.* (quoting *Habert Int'l, Inc. v. James*, 157 F.3d 1271, 1280 (11th Cir. 1998)) (emphasis added).

## ARGUMENT

SA McFarlane is entitled to pre-discovery summary judgment because there can be no genuine dispute he was acting within his discretionary authority and that his use of force did not violate Todashev's constitutional rights, let alone a clearly established one.

### A.      SA McFarlane was acting within his discretionary authority.

In the Eleventh Circuit, the threshold question in any case involving qualified immunity is whether the officer was acting within his discretionary authority. *Lee*, 284 F.3d at 1194. An officer acts within his discretionary authority if his actions (1) were undertaken "pursuant to the performance of his duties," and (2) were "within the scope of his authority." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988); *see also Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) (noting that an official acts within his discretionary authority if he "perform[s] a legitimate job-related function . . . through means that [are] within his power to utilize"). In applying this test, the Eleventh Circuit instructs courts to look to the "general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Holloman*, 370 F.3d at 1266. Thus, the inquiry is not whether an officer is authorized to use excessive force, but whether an officer is authorized to "engag[e] in searches and seizures in general [as] a part of his job-related powers and responsibilities." *O'Rourke v. Hayes*, 378 F.3d 1201, 1205 (11th Cir. 2004); *see also Grider v. City of Auburn*, 618 F.3d 1240, 1262 n.33 (11th Cir. 2010).

There can be no serious dispute that SA McFarlane was acting within his discretionary authority. "FBI agents, of course, are given explicit authority to investigate and seize." *Krohn v. United States*, 742 F.2d 24, 30 (1st Cir. 1984); *see also* 18 U.S.C. §§

3052, 3107. Here, the shooting occurred during the course of an interview about an event of unquestionable importance to federal authorities: Todashev's connection to one of the 2013 Boston Marathon bombers and both men's potential involvement in the Waltham murders. SA McFarlane participated in that investigation and interview pursuant to his duties as a Special Agent for the FBI. *See* Undisputed Facts ¶ 2. Plaintiff concedes as much by alleging that "[t]hese persons," including SA McFarlane "acted within the scope of their employment." SAC ¶ 122. The Eleventh Circuit has relied on similar language in a complaint to conclude at the summary-judgment stage that the defendant-officer was acting within his discretionary authority. *See Nam Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1279 (11th Cir. 2017). Plaintiff's concession, as well as the broad statutory authority granted to FBI agents, compels the same result here.[3]

Because there can be no serious dispute that SA McFarlane was acting within his discretionary authority, the burden shifts to Plaintiff to demonstrate that qualified immunity is improper. *Lee*, 284 F.3d at 1194.

**B.      SA McFarlane's use of force was reasonable under the Fourth Amendment.**

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. Amend. IV. "Any claim that a law enforcement officer used excessive force – whether deadly or not – during a seizure of a free citizen must be analyzed under the Fourth Amendment's 'reasonableness' standard." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *see*

---

[3] *See Wilson v. Miller*, 650 F. App'x 676, 681 (11th Cir. 2016) (officer within discretionary authority when he "used deadly force to protect himself from what he perceived reasonably to be an imminent threat of serious physical injury"); *Dupree v. Thomas Cty.*, 46 F. Supp. 2d 1372, 1375 (M.D. Ga. 1998) ("Even if defendants had intentionally shot the plaintiff, they would have been acting within their discretionary authority to use force, including deadly force.").

*also Saunders v. Duke*, 766 F.3d 1262, 1266-67 (11th Cir. 2014). "[R]easonableness is generally assessed by carefully weighing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (2017) (quoting *Tenn. v. Garner*, 471 U.S. 1, 8 (1985)). "The operative question . . . is 'whether the totality of the circumstances justifie[s] a particular sort of search or seizure." *Id.* (quoting *Garner*, 471 U.S. at 8-9). As the Supreme Court recently stated:

> The reasonableness of the use of force is evaluated under an objective inquiry that pays careful attention to the facts and circumstances of each particular case. And [t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Excessive force claims . . . are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred. That inquiry is dispositive: When an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim.

*Id.* at 1546-47 (internal quotations and citations omitted).

A court's task is to "measure the quantum of force employed against these factors – [1] the severity of the crime at issue; [2] whether the suspect poses an immediate threat to the safety of the officers or others; and [3] whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009); *see also Graham*, 490 U.S. at 396. Applying the *Graham* factors here, the incontrovertible evidence indicates, *first*, that Todashev was being investigated for his potential involvement in a brutal triple homicide – involvement supported by his finger and palm prints on a written partial confession. *See* Undisputed Facts ¶ 9. In addition, prior to being shot, Todashev had just violently assaulted SA McFarlane, a federal law enforcement officer, another crime of extreme severity. *Id.* ¶ 12. *Second*, in light of

- 14 -

Todashev's violent attack, there can be no genuine dispute that he posed an immediate threat to the safety of the officers, especially given that after attacking once, he ran into the kitchen, ignored repeated commands, and was aggressively advancing on the officers for a second time. *Id.* ¶¶ 14-16. *Third*, although Todashev was not evading arrest by flight, this same evidence indicates he was actively resisting the officers. *Id.* That is more than sufficient to satisfy the third *Graham* factor. *See Greer v. Ivey*, 242 F. Supp. 3d 1284, 1307 (M.D. Fla. 2017) (Mendoza, J.). All three *Graham* factors support the conclusion that the use of deadly force here was not unreasonable.

Although the *Graham* factors are useful, and in this case, dispositive, "[courts] cannot apply them mechanically." *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013). They "must still slosh [their] way through the fact-bound morass of 'reasonableness.'" *Id.* (citation omitted). *Graham* itself emphasized that the inquiry "requires careful attention to the facts and circumstances of each particular case." 490 U.S. at 396. For instance, in evaluating any use of force, courts must "allow for the fact that police officers are often required to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) (citation omitted). Since *Graham*, the Eleventh Circuit has particularly and repeatedly applied the Fourth Amendment reasonableness analysis in the deadly force context, and has specifically held that the use of deadly force is permissible when an officer:

> (1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible.

*Perez v. Suszczynski*, 809 F.3d 1213, 1218-19 (11th Cir. 2016) (citation omitted).

Most recently, the Eleventh Circuit has held that where a suspect posed a threat of serious harm to an officer or others, that *alone* is sufficient to justify a use of deadly force regardless of the applicability of the other *Graham* factors. *See Davidson v. City of Opelika*, 675 F. App'x 955, 958-59 (11th Cir. 2017) ("But the second factor . . . decides this case."); *Wells v. Talton*, 695 F. App'x 439, 444 (11th Cir. 2017) ("The mere failure to give a warning . . . does not preclude summary judgment where the facts otherwise indicate that the officer's use of force was reasonable.") (citation omitted); *see also cf. Hammett v. Paulding Cty., Ga.*, 875 F.3d 1036, 1050 (11th Cir. 2017) (in excessive force cases involving qualified immunity defendant-officer need only have had "arguable probable cause," *i.e.*, a reasonable belief that suspect posed a threat of serious harm). That means one pivotal question resolves this motion: did SA McFarlane have a reasonable belief that Todashev presented a threat of serious physical harm when he used deadly force? Based on the incontrovertible evidence, the answer is undoubtedly yes.

As an initial matter, Todashev was not some random individual SA McFarlane encountered on the street. SA McFarlane was aware that Todashev was adept in Mixed Martial Arts and wrestling, had a violent history, including prior arrests for resisting arrest and assault, and was a suspect in a brutal triple homicide. *See* Undisputed Facts ¶¶ 3, 6. This history is something a reasonable officer might certainly consider. *See, e.g.*, *Prostrollo*, 2014 U.S. Dist. LEXIS 139612, at \*24-26 (officer's awareness that suspect had combat training supported the reasonable perception that suspect posed a serious threat); *Troupe v. Sarasota Cty.*, No. 02-53, 2004 U.S. Dist. LEXIS 30944, \*22 (M.D. Fla. Ja. 22, 2004) (officer's awareness of suspect's prior violent history supported the

reasonable perception that suspect posed a serious threat). Moreover, in close-quarter situations like Todashev's apartment, there is always a reasonable risk that the suspect might overpower an officer, gain control of his gun, and become an even more lethal threat. *See Williams v. Deal*, 659 F. App'x 580, 602 (11th Cir. 2016) (where suspect struggles with officer, reasonable risk that suspect might grab officer's gun), *cert. denied*, 137 S. Ct. 1346 (2017). There can be no serious dispute that based on his history, a reasonable officer could have believed that Todashev possessed such violent capabilities.

Not only could a reasonable officer believe Todashev had violent capabilities, as the events rapidly unfolded and just prior to SA McFarlane's use of force, Todashev in fact assaulted SA McFarlane by throwing a table at his head. Photographic evidence confirms the serious head wound suffered by SA McFarlane as a result of Todashev's attack. *See* Undisputed Facts ¶ 12. Indeed, Todashev caused a significant gash that bled profusely all over SA McFarlane's clothes, requiring *nine* staples to his skull to close the wound. *Id*. Photographic evidence further depicts the flipped table on the floor that Todashev threw. *Id.* And DNA evidence confirms that the blood on SA McFarlane's clothes, as well as the blood on the table, belonged to SA McFarlane, not Todashev. *Id.* ¶ 13. Based on this incontrovertible evidence, there is no genuine issue of material fact that SA McFarlane's use of force was preceded by a violent attack by Todashev.

After the attack, Todashev ran into the kitchen, ignored repeated commands, was apparently looking for something, and re-emerged only to run full speed at the officers. *Id.* ¶¶ 14-16. SA McFarlane believed Todashev was retrieving a weapon and, in fact, Todashev retrieved a five-foot long pole. *Id.* SA McFarlane and Trooper Cinelli believed their lives were in danger. *Id.* ¶ 18. SA McFarlane then shot Todashev, who fell to the

- 17 -

ground. *Id.* ¶ 16. Undeterred, Todashev re-established his footing and lunged again. *Id.* SA McFarlane shot again, seconds after the initial volley, and Todashev fell again for the second and last time, *id.* – all facts supporting SA McFarlane's use of deadly force.

SA McFarlane's belief that Todashev posed a deadly threat is not just supported by his subsequent sworn statement. Nor is it just supported by Trooper Cinelli's belief at the time and *his* subsequent sworn statement. Contemporaneous photographic evidence confirms that a five-foot red pole was lying under Todashev's body where he was shot. *Id.* ¶ 17. In addition, the conduct leading up to Todashev's attack makes clear that SA McFarlane and Trooper Cinelli reasonably perceived his dangerousness. For example, after Todashev's demeanor and behavior changed, Trooper Cinelli placed Todashev's sword out of his reach and sent a text to SA McFarlane to "[b]e on guard. He is in vulnerable position to do something bad." *Id.* ¶ 8, 10-11. Those suspicions became a reality when, just moments later, Todashev violently threw a table at SA McFarlane's head. And the Eleventh Circuit is replete with cases holding that an officer is justified in using deadly force when the officer reasonably believes the suspect posed a threat of serious physical harm. *See Singletary v. Vargas*, 804 F.3d 1174, 1181-82 (11th Cir. 2015); *Morton*, 707 F.3d at 1281; *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005); *see also Greer*, 242 F. Supp. 3d at 1309-10 (collecting cases).

In fact, in a recent case, the Eleventh Circuit upheld the use of deadly force on constitutional grounds where the situation facing the officer was even less compelling than the facts evident here. *See Martinez v. City of Pembroke Pines*, 648 F. App'x 888, 893 (11th Cir. 2016). In that case, the suspect attacked an officer with the loose end of a handcuff, causing a head wound, ran into the kitchen, apparently looking for something,

ignored commands, and then re-emerged only to advance on the officers in a threatening manner without having retrieved a weapon from the kitchen. The Eleventh Circuit held that "there simply is *no question* that a reasonable officer could – and likely would – have perceived [the suspect] as posing an imminent threat of serious physical harm." *Id.* (emphasis added). Having attacked once, the court stated, the officer was not "required to wait and see what might happen if he allowed [the suspect] to advance further." *Id.* at 894. The court concluded that the officer's "decision to use deadly force was reasonable under the circumstances, and thus in compliance with the Fourth Amendment." *Id. Martinez* is sufficient to end this case, particularly given that in *Martinez*, the suspect re-emerged to attack without an additional weapon from the kitchen, and the undisputed facts here establish that Todashev re-emerged to attack with a weapon.

In another deadly force case, the Eleventh Circuit affirmed summary judgment on the basis of qualified immunity where the suspect wielded a stick. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003). Not surprisingly, other courts have held that where the evidence demonstrates that a suspect advanced toward an officer in an aggressive manner wielding a stick, summary judgment in favor of the officer using deadly force is appropriate. *See, e.g.*, *Woodward v. City of Tucson*, 870 F.3d 1154, 1162 (9th Cir. 2017); *Prostrollo v. City of Scottsdale*, No. 12-1815, 2014 U.S. Dist. LEXIS 139612, *24-26 (D. Ariz. Sept. 30, 2014). The same conclusion is required here.

And that would be true whether or not SA McFarlane saw the red pole when he discharged his weapon, particularly given the prior attack with the table. Indeed, just a few months ago, the Eleventh Circuit affirmed a grant of summary judgment in an excessive force case where the evidence showed that the suspect refused to show his

hands, the officer reasonably believed the suspect was carrying "something," and the suspect was moving aggressively towards the officers. *Hammett*, 875 F.3d at 1051. The court noted that the suspect ultimately was not armed, but emphasized: "we must view the situation from the perspective of a reasonable officer in [the defendant-officer's] position." *Id.* at 1051-52. Because the suspect refused to show his hands and moved aggressively towards the officers, they easily could have believed it was an "ambush." *Id.* at 1052. "Under these circumstances, [the officers] had probable cause to believe [that the suspect] posed a threat of serious physical harm." *Id.* Again, the undisputed evidence here shows that Todashev did retrieve a second weapon, the red pole. And, of course, SA McFarlane's use of deadly force was all the more reasonable given that Todashev had already attacked him with a weapon (the white table), causing a significant head wound seconds before he re-emerged to attack again.

That three of the seven shots entered Todashev's back, SAC ¶ 90, does not change the analysis. *See Mendez v. Poitevent*, 823 F.3d 326, 332 n.6 (5th Cir. 2016) (that suspect was unarmed and shot in the back is irrelevant to overcome qualified immunity where suspect first attacked officer and reasonable officer would not know whether suspect was fleeing or looking for a weapon to attack again); *Hudspeth v. City of Shreveport*, 270 F. App'x 332, 337 (5th Cir. 2008) (that suspect was unarmed and shot in the back is irrelevant to overcome qualified immunity where suspect first attacked the officers); *Warwick v. Snow*, No. 95-5250, 1996 U.S. App. LEXIS 15545, at *6-8 (10th Cir. June 27, 1996) (qualified immunity upheld in excessive force case where "[suspect] failed to come forward with facts sufficient" to show that officer violated the law, despite plaintiff's claim that there were genuine issues concerning whether "he was shot first in

the back or in the stomach"). In keeping with the Supreme Court's instruction that qualified immunity be viewed from the perspective of the officer on the ground and not with 20/20 hindsight, *see Graham*, 490 U.S. 396, the Eleventh Circuit has consistently taken a practical, common-sense approach to the question of qualified immunity when it comes to entry wounds in the back in the deadly force context. For example, in *Kenning v. Carli*, 648 F. App'x 763, 765, 768-70 (11th Cir. 2016), the Eleventh Circuit upheld a grant of summary judgment even where *all seven bullets* struck the suspect in the back because the officers reasonably believed that the suspect, facing away from them, was reaching for a weapon. Similarly, in *Hammett*, the plaintiff also tried to overcome a motion for summary judgment by pointing out that the fatal shot landed in the decedent's back. 875 F.3d at 1049. But as the Eleventh Circuit explained, "[t]he bullet hole in the wall and the location of Hammett's wounds, by themselves, tell us essentially nothing about what happened. There are infinite possible permutations that would explain how the bullets ended up where they did during the brief and chaotic scuffle that occurred." *Id.* at 1050. Instead, what was critical in *Hammett* was the fact that the decedent ignored commands and moved aggressively towards the officers. At that point, the use of deadly force was justified because the officers reasonably believed that the decedent posed a threat of serious physical harm. *Id.* at 1052. That decision compels the same result here.

In the end, the undisputed material facts are clear: Todashev chose to attack. Once he seriously injured one officer and re-emerged to attack again, SA McFarlane was not legally compelled to wait and see what else he had in mind. As this Court has recognized, "courts have discouraged law enforcement officers from delaying the use of force – even deadly force – where the circumstances demonstrate that such force is objectively

reasonable." *Greer*, 242 F. Supp. 3d at 1308; *see also Scott*, 550 U.S. at 385 ("We think the police need not have taken that chance and hoped for the best."); *Sheehan*, 135 S. Ct. at 1775 ("[I]t is reasonable for police to move quickly if delay would gravely endanger their lives or the lives of others.") (citation omitted); *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) ("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."); *Williams*, 659 F. App'x at 602 ("[A] police officer needn't risk his life on the chance that the advancing suspect has or will suddenly develop peaceful intentions.").

Given Eleventh Circuit precedent holding that an officer's reasonable belief that a suspect posed a threat of serious harm *alone* is sufficient to justify the use of deadly force (and the ample additional support for the reasonableness of his actions from other use of force cases), there are no genuine issues of material fact that SA McFarlane's use of force here was objectively reasonable under the Fourth Amendment. He is therefore entitled to qualified immunity under prong one of the qualified immunity analysis.

## C.      SA McFarlane's use of deadly force did not violate a clearly established constitutional right.

Even if this Court were to find a genuine issue of material fact as to whether SA McFarlane's use of force was objectively reasonable under prong one of the analysis – and Eleventh Circuit precedent makes this difficult if not impossible – SA McFarlane is certainly entitled to qualified immunity under prong two. Courts "generally compare the acts of each defendant to analogous case law to determine whether each defendant has violated a clearly established constitutional right." *Corey Airport*, 587 F.3d at 1288 n.6. If anything, the case law discussed above amply demonstrates that the use of force here was reasonable. The most analogous case is *Martinez*, which involved a 2010 shooting. There,

the suspect caused a serious head wound to the officer, ran into the kitchen, apparently looking for something, ignored commands, and re-emerged only to advance on the officers again. *Martinez*, 648 F. App'x at 893-94. The Eleventh Circuit held that despite the absence of an additional weapon from the kitchen there was "no question" the use of deadly force was reasonable. *Id.* at 893. Here, of course, there was a second weapon, the red pole. In another case, involving a 1996 shooting, the Eleventh Circuit held that the use of deadly force was reasonable where the suspect aggressively advanced on the officer wielding a stick. *McCormick*, 333 F.3d at 1243. In a third case, involving a 2012 shooting, the Eleventh Circuit held the same where the suspect advanced on the officers with no weapon at all but where the officers reasonably believed he had obtained one. *Hammett*, 875 F.3d at 1051-52. Nothing in this case law demonstrates that the use of force here was objectively unreasonable, and certainly not "clearly so."

SA McFarlane had to make a split-second decision on whether to discharge his weapon on a suspect who had violently attacked him just seconds before, and was aggressively advancing upon the officers for a second time. To defeat qualified immunity, Plaintiff must persuade this Court that "*every reasonable officer* in [SA McFarlane's] position inevitably would conclude that deadly force was unnecessary and thus unlawful under the circumstances." *See Santana*, 688 F. App'x at 770. Based on the incontrovertible evidence in this case, Plaintiff cannot come close to making that showing. *See Willingham v. Loughnan*, 321 F.3d 1299, 1304 (11th Cir. 2003) (recognizing lack of case law holding that officer's use of deadly force unreasonable where suspect (1) attempted to seriously injure officers, (2) was not under police control; and (3) was close to a weapon source). Thus, even if this Court finds there is a genuine

issue of material fact as to whether SA McFarlane's use of force was objectively unreasonable under the Fourth Amendment, he is entitled to qualified immunity under prong two of the qualified immunity analysis.

*          *          *

To oppose this motion, it is not enough for Plaintiff to simply disagree with the evidence presented herein. *See* 9B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2527 (3d ed. 2012) ("If all of the witnesses deny that an event essential to the plaintiff's case occurred, the plaintiff cannot get to the jury simply because the jury might disbelieve these denials. There must be some affirmative evidence that the event in question actually occurred."). Under the circumstances, it is also not enough for Plaintiff to speculate that Todashev was shot as he attempted to leave the apartment. *See Hammett*, 875 F.3d at 1050 (the assertion that suspect surrendered and retreated was pure speculation and insufficient to overcome a motion for summary judgment); *Williams*, 659 F. App'x at 583 ("But if the circumstantial evidence doesn't contradict a police officer's direct testimony, conjecture cannot create a genuine issue of material fact.") (citation omitted). And it is certainly not enough for Plaintiff to simply try to discredit the testimony of SA McFarlane or Trooper Cinelli. *See Anderson*, 477 U.S. at 256-57 ("discredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion"); *Hammett*, 875 F.3d at 1052 (prior inconsistent statements by officers about shooting incident insufficient to defeat motion for summary judgment). Nor is Plaintiff entitled to discovery merely to "test" this evidence. *See Smedley v. Deutsche Bank Trust Co. Ams.*, 676 F. App'x 860, 862 (11th Cir. 2017) (vague assertion by plaintiff that evidence is not reliable or trustworthy "without specifying additional

facts supporting her allegation, or from where or whom she could procure evidence to prove her allegations" is insufficient to entitle plaintiff to discovery).

"Rather, the plaintiff must present affirmative evidence." *Hammett*, 875 F.3d at 1052; *see also Garczynski*, 573 F.3d at 1165 ("[T]he non-moving party must produce substantial evidence in order to defeat a motion for summary judgment."). But Plaintiff cannot change the following events that led up to the shooting and rapidly unfolded: (1) Trooper Cinelli hid a sword from Todashev's reach and warned his fellow officers by text message to be on guard; (2) moments later, Todashev attacked SA McFarlane with a table so viciously that it required *nine* staples to his skull to close the wound, and (3) immediately following the assault with the table, Todashev re-emerged to attack again, this time with a pole. Forensics evidence shows that SA McFarlane, and not Todashev's blood, was on that white table; and contemporaneous photographic evidence confirms the hidden sword, the text message warning, the flipped table, the serious head wound that bled all over SA McFarlane's clothes, and the red pole under Todashev's body. In light of this evidence, Plaintiff simply cannot carry his burden of proving that Todashev's clearly established constitutional rights were violated by SA McFarlane's use of deadly force.

## **CONCLUSION**

For these reasons, this Court should grant the motion for pre-discovery summary judgment and enter judgment in favor of SA McFarlane.

This 5th day of February 2018.                              Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General, Civil Division

MARIA CHAPA LOPEZ
United States Attorney

C. SALVATORE D'ALESSIO, JR.
Acting Director, Torts Branch, Civil
Division

MARY HAMPTON MASON
Senior Trial Counsel, Torts Branch, Civil
Division

/s/ Siegmund F. Fuchs
SIEGMUND F. FUCHS
Trial Attorney, Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station
P.O. Box 7146
Washington, D.C. 20044-7146
Tel (202) 616-4322; Fax (202) 616-4314
siegmund.f.fuchs@usdoj.gov

Attorneys for the Individual Federal
Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 5, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notice of the filing to the following CM/ECF participants:

James V. Cook, Esq.
Thania Diaz Clevenger, Esq.
Tark Aouadi, Esq.
Daniel W. Eckhart, Esq.
David J. Officer, Esq.
Gregory P. Benoit, Esq.
Ralph E. Hopkins, Esq.

/s/ Siegmund F. Fuchs
SIEGMUND F. FUCHS
Trial Attorney, Torts Branch, Civil Division
U.S. Department of Justice