**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

ESTATE OF IBRAGIM TODASHEV, by
HASSAN SHIBLY, as Personal Representative
of the ESTATE OF IBRAGIM TODASHEV,
and for the Survivors, ABDULBAKI
TODASHEVE, Father, and ZULLA
TODASHEVA, Mother.

        Plaintiff,

v.                                  CASE NO. 6:17-cv-0919-CEM-DCI

UNITED STATES OF AMERICA and
AARON McFARLANE, CHRISTOPHER
JOHN SAVARD, CURTIS CINELLI, and
JOEL GAGNE, individually,

        Defendants.
_____/

**INDIVIDUAL FEDERAL DEFENDANT AARON McFARLANE'S
MOTION FOR PRE-DISCOVERY SUMMARY JUDGMENT**

**Exhibit 1**

# DEPARTMENT OF JUSTICE

# FEDERAL BUREAU OF INVESTIGATION

Estate of Ibragim Todashev

v.

United States et. al. (6:17-cv-0919-CEM-DCI



EXCISED COPY

**DELETION CODES**

F. ADMINISTRATIVELY DESIGNATED FBI FILE NUMBERS, WHICH REPRESENT INDIVIDUALS OR MATTERS WHICH ARE NOT THE SUBJECT OF THIS FILE.

G. THE LAW ENFORCEMENT PRIVILEGE - THE DISCLOSURE OF THIS INFORMATION COULD CAUSE HARM TO, IMPEDE, IMPAIR, OR HINDER AN INVESTIGATION AND/OR AN INVESTIGATIVE INTEREST OF THE FBI.

H. THE LAW ENFORCEMENT PRIVILEGE - THE DISCLOSURE OF THIS INFORMATION WOULD IMPEDE OR IMPAIR THE EFFECTIVENESS OF AN INVESTIGATIVE TECHNIQUE, METHOD OR PROCEDURE OF THE FBI.

P. THE PRIVACY ACT OF 1974, 5 U.S.C. § 552a

P-1 INFORMATION, THE DISCLOSURE OF WHICH WOULD BE AN UNWARRANTED INVASION OF THE PERSONAL PRIVACY OF AN INDIVIDUAL NOT PARTY TO THIS MATTER.

I, Special Agent Aaron McFarlane, having been sworn by Assistant Inspector [(P), (P-1)] and Assistant Inspector ~~in Place~~ Heather Buthers [(P), (P-1)] who I know to be Supervisory Special Agents (SSAs) of the Federal Bureau of Investigation (FBI), hereby make the following voluntary statement. Present in the interview was FLEOA Attorney Larry Berger.

I have been advised this is an inquiry concerning the shooting and use of force incident which occurred on 05/22/2013, at 6022 Peregrine Avenue, Orlando, Florida 32819.

I have read and signed a document entitled, "Warning and Assurance to Employee Requested to Provide Information Following A Shooting Incident."

I entered on duty as a Special Agent (SA) of the FBI on 11/08/2008. I was assigned to the Boston Field Office after completing New Agent's Training at Quantico, Virginia. I have served on Squad C-6, since October 2010. Prior to that assignment, I was assigned to Squad C-5 Economic Crimes. My responsibilities on Squad C-6 include the Violent Incident Crime Program. In addition to my primary duties, I also serve as a member of the Boston Field Office's Special Weapons and Tactics (SWAT) team, for which I was selected three years ago.

Prior to my employment with the FBI, I was a Police Officer for the Oakland Police Department from 1999 to 2005. My law

1

enforcement experience includes hundreds of arrests and numerous high risk search warrants.

I have received a variety of specialized training in the FBI, to include safe streets survival, breaching, specialized tactical, close quarter combat, and firearms.

At the time of the operation, I was carrying my FBI-issued Glock 23, .40 caliber, with a chambered round and a fully loaded and topped off magazine with service ammunition.

Approximately one week after the 04/15/2013 bombings in Boston, I was assigned to work with the Massachusetts State Police (MSP) on a triple homicide that occurred on 09/11/2011 in Waltham, Massachusetts, in which Ibragim Todashev was a suspect. My MSP partners were Trooper Joel Gagne, who is a homicide expert, and Trooper Curtis Cinelli, who is a fugitive investigator. I was tasked to work with the Tampa Field Office, Orlando Resident Agency (ORA) to conduct an interview of Todashev about the homicide and any connections he may have to the Boston bombings on 04/15/2013.

I studied the background of Todashev and had a very good understanding of how much training he had in Mixed Martial Arts (MMA) and wrestling. During our investigation, I personally viewed several of Todashev's MMA fights on YouTube. Various interviews of Todashev's associates also indicated that he was an adept wrestler, and had competed in the sport for many years.

2

¶ I also understood that Todashev had been previously arrested in a road rage incident in Boston, Massachusetts, as well as an incident in Orlando, Florida. The arrest in Florida stemmed from a fight over a parking space in which Todashev fought with two individuals, one of which was knocked unconscious and lost several teeth. FBI Agents surveilling Todashev witnessed this event and relayed the details directly to me. On a scale of one to 10, I believed Todashev was an eight as far as his inclination and ability for physical violence.

During the week of 05/13/2013, myself and the MSP Troopers traveled to the ORA to interview Todashev regarding his time in Boston around the date of the homicide, no direct questions of the crime were planned. Upon arrival we decided ORA Agent Robert Manson and Task Force Officer (TFO) Chris Savard would conduct the interview with Todashev since they had a rapport with him. The interview was conducted and we received pertinent information on the homicide and bombing investigations.

Once back in Boston, I learned that Todashev had tentative travel plans to return to Russia on 05/24/2013. The TFO's and I were instructed to travel back to the ORA in order to interview Todashev regarding the triple homicide. We arrived on 05/20/2013 and asked TFO Savard to call Todashev to negotiate an interview. On 05/21/2013, TFO Savard convinced Todashev to meet with us. Todashev stated that he would not meet with us at the

3

Orlando Police Department as he did previously, and that if we wanted to meet, we had to come to him. Todashev eventually agreed to meet with us for one hour at his apartment.

On 05/21/2013, at 7:30 PM, myself, the MSP Troopers, and TFO Savard met Todashev at his apartment in the parking lot. He was calm and respectful and led us to his apartment. I and the MSP Troopers went to the apartment and TFO Savard remained outside in the parking lot. Prior to entering Todashev's apartment, we observed a large image of an AK-47 at the top of the front door. Todashev stated something to the effect that other Agents had previously observed the image, but that he could not remove it easily. Upon entering the apartment, Todashev asked us to remove our shoes and I noticed the room was very dark and hot. Todashev, turned on the kitchen light which dimly lit the entire first floor. There were no other light fixtures on the first floor that functioned. As I proceeded into the living room, I immediately noticed a sward hanging on the wall near the stairs. I was the first one in the room and I sat on the second stair step that led to a loft which was also unlit. Trooper Gagne sat in a chair in the living room and Trooper Cinelli stood against the stairwell wall. Todashev then opened the louver blinds covering the sliding glass door at the rear of the apartment's first floor. It was still light outside, so the interior lighting was improved, although still

4

dimly lit. Todashev sat on the floor directly across from Trooper Gagne and in front of me to my left.

At approximately 7:45 PM I started the interview by asking some indirect questions. At approximately 8:30 PM, Trooper Gagne started direct questioning of Todashev about his presence in Boston during the time of the triple homicide. During this portion of the interview Trooper Cinelli asked Todashev a direct question. It appeared Todashev did not like his tone and he replied "don't talk to me like that!" while pointing his finger directly at Cinelli. At that point, I felt that Todashev's stress level was very high, and that the possibility for him to react in a physical way was increased. I based this on my training and experience and my personal knowledge of his demeanor and capabilities. As a result I was on guard for any precipitous change in his behavior.

For the next three hours we continued to question Todashev in regards to the Waltham triple homicide. Todashev eventually alluded to the fact that he was going to tell us some information regarding the homicides, but that he first wanted to smoke a cigarette. Todashev also started twitching and looked very uncomfortable. Todashev signed a Miranda waiver form at the point we felt he made enough statements to incriminate himself. At the end of the questioning Trooper Gagne asked Todashev to write his statement down, and he agreed to do so.

5

Todashev began to ask whether he would be able to smoke in jail, how much time he would get, and if he would get a deal. We made no comment back to him indicating in any fashion that he was going to be arrested or go to jail. However, I felt at this point that Todashev knew he was going to jail and he began to appear resigned to that fact. He had written approximately ¼ of a page of his confession when Trooper Gagne left the apartment to make a phone call to the Middlesex Assistant District Attorney and I took his chair. Todashev moved to the edge of the bed 6 to 7 feet directly in front of me and was writing on a small table. Trooper Cinelli stood in the same location against the wall. At this point Todashev was still writing and had not made any overt actions.

Todashev then requested to use the restroom for the third or fourth time. It should be noted that on each prior trip to the bathroom, which was located at the top of the stairs, it created a heightened sense of awareness for our safety. On this last trip to the bathroom, Todashev urinated only one quick burst, which led me to question whether he had to really go to the bathroom at all. Trooper Cinelli and I made eye contact and gestured to one another that we need to be well aware of the threat Todashev posed in this position. The bathroom door was open, and Trooper Cinelli and I were able to observe Todashev from the back. After he was done urinating, Todashev reached

6

over to the sink with his left hand and turned on the water. He then ran the water over his left hand, slowly brought his hand in front of his face. While looking down, he let the water drip from his fingers into the toilet. He slowly opened and closed his hand while waving his fingers. He repeated this process three to four times before slowly closing his fly and wiping his hands on the front of his pants. When he had finished in the bathroom, Trooper Cinelli and I went down the stairs with Todashev, where we returned to our previous positions. Todashev then resumed writing his statement.

I was reading my notepad when I heard a loud noise and suddenly felt a blow to the back of my head. I was knocked partially off my chair, but I caught myself. I saw Todashev running past me and I tried to grab him. I removed my weapon from the holster and aimed the gun at Todashev who had run towards the kitchen. I shouted "show me your hands!" I saw Trooper Cinelli to my left, but don't know if he had his weapon drawn. I stood in the middle of the room and saw Todashev partially in the kitchen. I continuously yelled for Todashev to show me his hands, but he did not comply. I heard the sound of metal banging together like knives in a very hurried fashion. I believed that Todashev was trying to retrieve a weapon, and that he was successful in doing so.

7

Todashev instantly ran at full speed from the kitchen directly towards me and Trooper Cinelli. I saw Todashev's left shoulder drop as he rounded the corner from the kitchen to the living room. It was obvious to me that Todashev was in an attacking posture. In the split second available to me to assess the threat posed by Todashev's wholly non-compliant actions, I was in fear for my life and the life of Trooper Cinelli. There was no doubt in my mind that Todashev intended to kill both of us. In order to stop this threat, I shot Todashev three to four times. Todashev fell backwards, but did not go to the ground. He then re-established his footing and suddenly lunged again towards us. I then shot him 3 or 4 more times in order to stop his continuing deadly threat. This time Todashev fell to the ground face first and I believed the threat had been eliminated.

Trooper Cinelli applied first aid to my head and Trooper Gagne and TFO Savard entered the room. I yelled that everything was okay. Trooper Cinelli checked Todashev for a pulse, but could not locate one. TFO Savard called 911 for medical assistance. Once the fire department arrived I was transported to the hospital for my head injury.

8

*AM* 5/28/13

I have read the statement consisting of 9 pages and a diagram, and it is true and correct to the best of my recollection.

Aaron William McFarlane
Special Agent


Sworn and subscribed before me this 28th day of May 2013, in Boston, Massachusetts.

(P), (P-1)

Assistant Inspector

Heather L. Butters
Assistant Inspector

9

*AM* 5/28/13