**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| ESTATE OF IBRAGIM TODASHEV,<br><br>     Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA et al.,<br><br>     Defendants. | CIVIL ACTION<br><br>Case No. 6:17-cv-919-CEM-DCI |

**RESPONSE TO THE UNITED STATES'
PREDISCOVERY MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Plaintiff, HASSAN SHIBLY, and responds to the United States Pre-Discovery Motion for Summary Judgment, and would show as follows:

1. Defendant United States of America (USA) seeks summary judgment without benefit of discovery because the "incontrovertible" evidence shows that just prior to the shooting, the decedent violently attacked Aaron McFarlane with a table, causing a huge bleeding gash on his head.

2. Defendant United States goes on to add additional "undisputed facts":

   a.  After attacking McFarlane decedent ran into the kitchen;

   b.  Decedent appeared to be looking for something;

   c.  Decedent returned to advance aggressively on McFarlane and Cinelli;

   d.  Decedent had a weapon, a red pole;

   e.  Therefore, McFarlane's shooting decedent was objectively reasonable;

   f.  Therefore, McFarlane is entitled to qualified immunity.

1

## PLAINTIFF'S STATEMENT OF
## DISPUTED AND ADDITIONAL FACTS

Admitted that the incident giving rise to this suit occurred on or about May 22, 2013, and that Aaron McFarlane was then a federal law enforcement officer. Admitted that it appeared that McFarlane's agency, the FBI, was interested in Ibragim Todashev because he had trained at a Boston gym with the deceased Tamarlan Tsarnaev, then a suspect in the Boston Marathon bombing.

Disputed that Todashev was a "suspect" in a triple homicide that occurred in Waltham, Massachusetts. In fact, McFarlane was working with the lead Massachusetts State Police investigator, Joel Gagne, who was careful to say that Todashev was only "a person of interest" in the case and that there was "nothing concrete." (Exhibit A, Interview with Joel Gagne, 5:1-3).[1] Curtis Cinelli, the junior investigator, recently assigned, to the contrary, did refer to Todashev as a "suspect." (Exhibit B, Interview with Curtis Cinelli, 8:20-24).

Plaintiff admits that at the time of the events giving rise to this lawsuit, Mr. Todashev was living in Orlando Florida. Disputed that he planned to return to Russia on May 24, 2013. In fact, prior to the events that gave rise to this lawsuit, Mr. Todashev had cancelled his flight to Russia in order to answer what he was told were a few final questions so that the Waltham matter could be put to rest, at

---

[1]All the Defendants names are redacted from their statements, but it is clear from their descriptions of their histories and roles in the events complained of who they are.

2

least as far as his participation was concerned. (Exhibit C, Affidavit of Tatiana Gruzdeva, ¶ 28-29).

Admitted that Orlando Police Officer, and Task Force Officer, Christopher Savard had the task of organizing the activities of FBI Agent McFarlane and Massachusetts State Police Officers Gagne and Cinelli while they were in the Orlando area, that he set up the "final meeting" with Mr. Todashev, and further noted that he had set up constant surveillance of Mr. Todashev. Officer Savard first made contact with Mr. Todashev on April 21, 2013, according to his statement. (Exhibit D, Interview with Christopher Savard, 3:16-23).

Tatiana Gruzdeva, Mr. Todashev's girlfriend, remembers the April 21, 2013, contact. Ibragim Todashev when outdoors to exercise his injured knee. Ms. Gruzdeva was washing dishes near the open window when she heard, "Get down, get down!" She saw six or seven people in plain clothes putting Mr. Todashev down on the ground at gunpoint. They then handcuffed him. Some of the men opened the glass door and entered the apartment without seeking consent. They searched the home without consent. They stayed about 4-5 hours. They questioned Todashev and Gruzdeva first in the same room and then separately. They took Todashev with them when they left, and also took all the phones, computers, and electronic devices. Mr. Todashev returned about six hours later. The electronics were only returned the day of Mr. Todashev's death a month later. It should be

emphasized that none of the aggressive actions of Savard and his team were justified by probable cause, none were consented to. There was no warrant. (Exhibit C, Affidavit of Tatiana Gruzdeva, ¶ 10-23).

The aggressive tactics continued. Ms. Gruzdeva saw the agents following Todashev and her every day. Savard admitted to witnessing the incident at the mall parking lot where two men attacked Mr. Todashev for taking a parking spot they wanted. (Exhibit D, Interview with Christopher Savard, 9:8 to 10:13).[2] After the fight at the mall, Orange County Sheriff's Deputies were actually "staging and waiting" for Todashev, stopped him, and took him out of his car at gunpoint, made him get on the ground. (Exhibit E, Interview with Deputy Anthony Riccaboni, 4:1-8). Deputy R indicated "there were three vehicles behind us . . . . half on the grass and half on the road," and Sheriff's Lt. Chris Francisco told R that they were FBI agents. (Id., 13:3 to 14:7).

Admitted that FBI Agent McFarlane was aware that Mr. Todashev had trained in Mixed Martial Arts and wrestling and further noted that McFarlane was aware that Todashev was a skilled and disciplined martial arts amateur who held back when he was attacked by the two men in a parking lot and did no more than necessary to defend himself. A security guard who saw the incident said of

---

[2] It is not clear whether Savard saw this live or on video. Savard mentions aerial surveillance. They may have had a drone with a video camera. (Exhibit D, Savard Interview, 9:20).

Todashev, "It basically looked like he was trying to defend himself, block, whatever the son was punching and everything. . . Everything (inaudible) was the son who would run towards Ibragim and try and attack him and basically Ibragim would knock him and blocked him, ah, try and defend himself." (Exhibit F, Interview with Security Guard Tariq Alli, p. 3).[3]

Disputed that Todashev caused one of his attackers to lose several teeth.[4] The fact that Todashev was arrested instead of his attackers appears to have been a product of Officer Savard's coordination of local law enforcement agencies since FBI vehicles lined the road behind Sheriff's vehicles as the "arrest" was taking place. No conviction could have resulted because of the strong testimony of the security guard who would have testified to Todashev's self-defense, Id., (and also because of Todashev's intervening death at the hands of the Team).

Also disputed that Todashev was involved in a "road rage" incident. Mr. Todashev had been involved in a fender-bender and someone at the scene called him a "motherfucker." It can be reasonably inferred that because Mr. Todashev was from another cultural tradition and because he was not entirely familiar with

---

[3] The security guard did not know of Ibragim Todashev before that day but learned about him after the incident and watched some of his matches on line.

[4] The younger of the two men who attacked Todashev in the parking lot in May 2013 was named Lester Garcia. He and his father fought Todashev over a parking spot they wanted and Todashev pulled into it. Garcia was interviewed by Investigator Nelson Espinosa after Todashev's death. "Q. And so you lost a couple teeth? Ah – it was, it didn't went apart but it, they, he moved my teeth pretty bad to the back." (Exhibit N, Interview with Lester Garcia, 6:18-20).

the American custom of using the term "motherfucker" with little provocation and without literal application, he apparently believed the person was making a comment that referred to his own mother and was outraged, stating, "You say something about my mother, I will kill you." He did not, of course, kill anyone. At his death, Mr. Todashev had no criminal history of violence and on numerous occasions, was observed to show restraint.[5]

It should be noted that Ibragim Todashev trained at the Boston gym not only with Tamerlan Tsarnaev, but with other mixed martial arts amateurs, including the Harvard Wrestling Team, and was apparently respected at the gym. (Exhibit G, Interview with John Allen, owner of the Wai Kru martial arts gym, Boston, Massachusetts, 5:12-18). McFarlane and Cinelli's casting Mr. Todashev as a "dangerous individual" is largely exaggerated, self-serving and propagandistic.

Admitted that it is plausible that Mr. Todashev's "stress level" increased as the evening wore on. First of all, he was given to believe by the officers that this was going to be a 30-45 minute meeting to nail down some details before closing the case with regard to him. (Exhibit H, Affidavit of Khusen Taramov, ¶ 4). Secondly, the questioning became more aggressive as time passed, to the point that Defendants quote Todashev as stating, "Don't talk to me like that." (Exhibit I,

---

[5] At one point, the USA talks about "arrest history" and later, that becomes "criminal history," just as Gagne's "person of interest . . . nothing concrete," becomes Cinelli's "suspect." The USA is essentially mounting a "jury argument" rather than steadfastly observing evidentiary rules.

Statement of Aaron McFarlane, p. 5). Finally, the Defendants admit to following him around in the apartment, watching him go to the bathroom, a scenario that was very different from that conveyed to him by Officer Savard. (Id., p. 6). The stress resulted from the pressure brought by Defendants. This is part of the FBI policy of aggressive tactics designed to "squeeze" a suspect and "make or break" the case.

Plaintiff does not admit, and demands strict proof of, the allegation that Todashev made a statement "acknowledging some involvement" in the Waltham murders. Agent McFarlane is deliberately vague in characterizing Todashev's statements about "involvement" so that they could refer to anything from giving someone directions to Waltham, Massachusetts, to participating in a crime. He is so vague about time that it is impossible to determine at what point during the evening he, McFarlane, believed Todashev implicated himself in a crime.[6]

Plaintiff disputes that McFarlane's assertion that he "had a heightened sense of awareness" for his and Trooper Cinelli's safety, (Doc. 61, p. 4; Exhibit I, Statement of Aaron McFarlane, p. 6) at the time that he says he was hit in the back of the head by a part of a table is a reasonable inference. It is unlikely that both could be true. It is also possible that he was feigning inattention in order to make Todashev feel that it would be a good time to try to flee from the apartment.

---

[6] Plaintiff does not concede that any writing as an exhibit is genuine, or that palm or hand prints on a tablet are consistent with Mr. Todashev's having written on the tablet and would certainly insist on inspecting and testing any alleged evidence produced by the USA.

Plaintiff also disputes that McFarlane's description of an attack is consistent with the physical evidence at the scene, the location in which decedent's body was found, the location of the bullet wounds, or the testimony of Officer Cinelli. Plaintiff would point out that the Defendants excluded others, including forensic professionals, from the scene for several hours during which time, evidence, a missing slug, disappeared and reappeared in an unexpected location, and the integrity of the crime scene was compromised in a way that is inconsistent with police professional standards. (Exhibit J, Interview with Dan Coughlin, 3:11-14; 7:3-8; 8:5-7).

Plaintiff disputes that McFarlane's account of Mr. Todashev's actions and that of Officer Cinelli could both be true, or that given the description by Cinelli that Mr. Todashev was running at him, fell down, rose, lunged at him again, and fell again, was consistent with Todashev's body lying about one running stride from the front door, or would be consistent with the location of the bullet entry wounds. Plaintiff notes that McFarlane does not report seeing a weapon in Todashev's hands, while Cinelli claims he sees a red pole held over Todashev's head.[7] Savard, in his call to the dispatcher, first says McFarlane was "stabbed" which is inconsistent with any other scenario except possibly McFarlane's

---

[7] A red pole, apparently a broomstick, is photographed under Todashev's body, but in an unlikely position, given Cinell's description that Todashev was holding it over his head like a javelin. Further, there were no fingerprints belonging to Todashev anywhere on the pole. (Exhibit K, DOJ Civil Rights Division Report).

statement that it sounded like Todashev was getting a knife or sword and it may simply indicate (as does the differences in Cinelli's and McFarlane's accounts) that the story simply had not been decided on at that point.

Plaintiff disputes that there is any scenario in either McFarlane's or Cinelli's account of the shooting that is consistent with three gunshot wounds in Mr. Todashev's back, and if he were holding a pole over his head, he could not have received wounds that went though his upper arms and then entered his chest. The suggestion that McFarlane's bullets caused Todashev's body to "twist" around is inconsistent with forensic science. (Exhibit L, On The Physics Of Momentum In Ballistics: Can The Human Body Be Displaced Or Knocked Down By A Small Arms Projectile?, *Int. J Legal Med*, 1996, 109: 147-149). Plaintiff demands an opportunity to retain experts and do models and tests.

Although at the point of the shooting Trooper Gagne and Officer Savard are outside the doors, they are being kept advised by texts moment-by-moment and the language of the texts seems strange and code-like. (Exhibit D, Interview with Christopher Savard, 13:12-22). It seems to be a reasonable inference that Gagne and Savard, both armed, are guarding the doors and the texts may be intended to convey that Todashev might be about to try to run. That would explain why officers outside the apartment would be warned to be on guard. In addition to the flow of text messages, the officers outside could hear loud voices inside the

apartment. They were very much aware of events.

Plaintiff concedes that McFarlane received an injury to his head but does not concede that the injury was caused by Mr. Todashev, or that it happened just prior to the shooting.

**MEMORANDUM OF LAW**

Summary judgment is appropriate when the pleadings and the evidence demonstrate "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant may support its motion by identifying those portions of "discovery and disclosure materials on file, and any affidavits" that it believes demonstrate the absence of a genuine issue of material fact. Fed.R.Civ.P. 56(c); *see Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

Pre-discovery summary judgment motions are usually premature and hence disfavored. *See, e.g., Americable Int'l Inc. v. Dep't of Navy*, 129 F.3d 1271, 1274 (D.C.Cir.1997); *Tabb v. District of Columbia*, 477 F.Supp.2d 185, 188 n. 1 (D.D.C.2007); *Iacangelo v. Georgetown Univ., Civil Action No. 05–2086*, 2007 WL 915224, at *3 (D.D.C. Mar. 26, 2007). *Bourbeau v. Jonathan Woodner Co*., 600 F. Supp. 2d 1, 3 (D.D.C. 2009); *see also Celotex*, 477 U.S. at 322, 106 S.Ct.

2548 (summary judgment is normally appropriate after "adequate time for discovery"); *Tabb v. District of Columbia*, 477 F.Supp.2d 185, 188 n. 1 (D.D.C.2007) (noting that a pre-discovery summary judgment motion "usually is a disfavored practice"). Here, the motion for summary judgment was filed prior to discovery. The only available testimonial evidence regarding the facts of the case are declarations and affidavits by Defendants. The question, then, is whether the record now before the Court is sufficient to warrant summary judgment for the government at this early stage in the proceedings. *See Thompson v. Fathom Creative, Inc.*, 626 F. Supp. 2d 48, 53 (D.D.C. 2009).

In order to fully respond to the allegations in the affidavits and other papers of the United States and the other Defendants, Plaintiff needs sufficient time to conduct discovery, including third-party discovery, and to examine the witnesses in deposition. Plaintiff has made that Declaration pursuant to Fed.R.Civ.P. 56(d).

## A. The USA Admits to Killing Todashev But Their Descriptions of How the Killing Took Place Leave an Inference that It Was Unjustified.

Plaintiff is entitled to relief against the United States because it placed Ibragim Todashev in its custody unlawfully and unlawfully harmed him. To the extent that Plaintiff's allegations have been inarticulate or incomplete, Plaintiff can and will seek to further amend to correct these deficiencies. The body of evidence that will ultimately called out to adjudicate this case on the merits are in the vaults of the government and to the extent that they goad the Plaintiff to give further and

finer details for the sake of "notice" to them, they are being disingenuous.

The focus on Ibragim Todashev began because he was an acquaintance of, and briefly trained at a gym with, Tamerlan Tsarnaev and like Tsarnaev, he was a Chechen Muslim. FBI Agent Aaron McFarlane came to Orlando, Florida, along with Massachusetts State Troopers, Curtis Cinelli and Joel Gagne who were working on a Massachusetts homicide Tamerlan (who by then was dead) may have been involved in. Gagne made clear that Todashev was merely "a person of interest," and that they had "nothing concrete." They just wanted to talk to him. (Exhibit A, Gagne Interview, 5:1-3).

There, McFarlane, Cinelli, and Gagne met Orlando Police Officer Christopher John Savard. The four men planned to place pressure on Todashev by following him wherever he went, making it clear that he was being followed, always traveling in three to five black vehicles. At some point Savard had Todashev and his girlfriend taken into custody and his apartment searched.

Later, Savard convinced Todashev to come to the Orlando Police Department. Todashev came with his girlfriend who waited for him outside. While Todashev was being questioned by Savard, other officers approached his girlfriend and asked her to spy on Todashev. When she refused, they called immigration and had her arrested. She was taken to jail and later deported.

The four men followed Todashev, or had him followed, day and night. At

one point, Todashev was assaulted during an argument over a parking spot at a mall. A security officer on the scene told these officers that Todashev had simply defended himself against two men who rushed him repeatedly. Nevertheless, McFarlane, Savard, and the others, characterized the encounter as a violent assault by Todashev and that officers should be aware that he was highly dangerous.

Shortly thereafter, Todashev was arrested by Orange County Sheriff's Deputies at gunpoint and forced onto the ground based on the report that Todashev had criminally assaulted the two men. At the time of the arrest a string of FBI vehicles were stopped along the road behind the Sheriff's cares.

When McFarlane learned that Todashev was returning to Russia to visit his parents, Savard was asked to set up another interrogation. Todashev was told that they just wanted to talk to him once more and then they were going to close the case file. Savard asked Todashev to come again to the Orlando Police Department but Todashev was very mistrustful because of the arrest and deportation of his girlfriend the last time he came there. He agreed to meet the officers at a "Hookah Bar" but they compromised by agreeing to meet at the place he stayed at.

The meeting at Todashev's apartment was supposed to be a brief affair. The four officers, however, intended to make it more inquisitorial. Officers covered the exits. Todashev's friend Khusen Taramov was not allowed to enter and Todashev was not allowed to leave. Officers outside watched the door. Officers inside

followed Todashev everywhere, even watching him urinate. Questioning got intense. At one point, Todashev told one of the troopers, "Don't talk to me like that." Todashev asked to go for cigarettes and was refused. If Todashev thought the encounter was consensual, he soon learned it was not.

As pressure mounted, the officers inside texted that they thought he was about to do something. Gagne left the apartment. Savard ordered Taramov to leave. With only Cinelli and McFarlane left in the apartment, around midnight, a series of shots rang out. Then there was silence. Then another series of shots.

When emergency personnel arrived, they are barred entry. Forensic investigators were turned away for hours. The press was told Todashev had attacked the officers with a knife and stabbed them. Later, they were told he tried to skewer Cinelli with a broom handle. However, there were no fingerprints found on the implements Todashev was supposed to have used. (Exhibit K, Report of DOJ Civil Rights Division).

Bullets had entered Todashev's body from different angles and different parts of his body. Two of the bullet entry wounds were in his back. One was on the top of his head. The investigator for the local state attorney did a travesty of an investigation, encouraging witnesses not to mention the names of the persons involved. Highly redacted interview transcripts were circulated. Video recordings were withheld from the press. The Massachusetts ACLU has been trying for years

to get the government to turn over essential records without success.

### B. Defendants Seek Qualified Immunity Based on Their Own Self-Serving Facts and Inferences Rather Than Those of the Non-Moving Party

While the USA has been closed-handed with the facts on the incident,

Defendants McFarlane and Savard subtly and not-so-subtly try to import what they

suggest are the real extrinsic facts into their motion for summary judgment:

a. That Orlando Police Officer Christopher John Savard is definitively a federal agent. (Doc. 36, p. 13)

b. That Khusen Taramov was "asked" to remain outside (Doc. 36, p. 4) (we said "made")

c. That Gagne went outside to call a district attorney (we said he claimed that; we did not concede that was his purpose). (Doc. 36, p. 4)

d. That the forcible sequestration of Todashev was only a "coercive interrogation" as in *Chavez*. (Doc. 36, p. 8)

e. That there was a lawful predicate for the forcible sequestration and coercive interrogation. (Doc. 36, p. 9)

f. That there was no criminal case (they claim to be talking to a district attorney contemporaneously with the interrogation). (Doc. 36, p. 8)

g. That only McFarlane fired his weapon (Plaintiff does not concede this: seven rounds entered Todashev from different angles; Cinelli has him twisting back and forth from bullet impacts but ballistics experts don't support that theory popularized by movies). (Doc. 36, p. 25)

h. That prior to shots being fired, Todashev flipped a table that hit McFarlane in the head and swung a painted staff-like object down at Cinelli who was poised to ward off the blow. (Doc. 37, p.9)

i. That it is "beyond doubt" that Savard and Gagne could not have seen what happened in the apartment. (Doc. 37, p. 8)

j. Cinelli never anticipated the shots by McFarlane. (Doc. 27, p. 16)

### C. Defendants Had No Lawful Basis for Todashev's Detention

Although there was no prior basis to suspect Mr. Todashev of terrorism or, for that matter, any offense, the lead Massachusetts State Police Investigator, Defendant Joel Gagne, considered him a "person of interest" for whom there was "nothing concrete." (Exhibit A, Interview with Trooper Joel Gagne, 5:1-3).[8] The Defendants, working together, sought to manipulate him into a custodial interrogation presented as a consensual encounter. Todashev was told officers simply wanted to talk to him one last time before he left for Russia to visit his parents. And at first it was "real cordial, real relaxed. The "questions we began with were . . . real easy and not confrontational." (Id., 12:4-6). However, what was to come was clearly a "third degree" interrogation in which he was cut off from supportive friends and it was made clear that he was not free to leave.

Although Defendants have not yet answered Plaintiff's Amended Complaint, Plaintiff anticipates that they will argue that Mr. Todashev voluntarily consented to the interrogation and that the consent was not withdrawn. This question must be determined by the totality of the circumstances, which must show that his consent was in fact voluntary rather than "the product of duress or coercion, express or

---

[8] Gagne's name is redacted from the interview so that you can only see that he was one of two Massachusetts State Troopers interviewed but it is possible to discern which one he was by the description he gives of what he did. He was the one who left the apartment before the shooting. Trooper Cinelli stayed with Agent McFarlane. (Exhibit A, Interview with Trooper Joel Gagne).

implied." *United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1979), *citing Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). The defendants have the burden of proving voluntary consent, *Schneckloth* at 222, 93 S.Ct. at 2045. Circumstances "may exert pressure on the individual to acquiesce. Such acquiescence cannot, of course, substitute for free consent." *Bumper v. North Carolina*, 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968), *McQurter v. City of Atlanta, Ga.*, 572 F. Supp. 1401, 1412 (N.D. Ga. 1983).

The United States claims to have video recordings and documentary evidence of what happened that night and seem desperate to close down Plaintiff's theories of liability before that evidence – which has been withheld from public view – can be discovered in this case. Given the government's secretiveness where, even more than four years later, a case does not appear to involve national security, the obvious concern is for the Defendants' fear of public scrutiny.

Although the acts of Defendant McFarlane, Savard, Cinelli, and Gagne, in effectively sequestering Todashev in violation of the Fourth Amendment was inherently coercive, the more germane question is whether the Defendants collectively planned to violate the Fourth Amendment for the purpose of seeking incriminatory statements. Even if the end in view was not necessarily the use of deadly force, the U.S. Constitution was outraged in a way that is actionable. If

Todashev was not free to leave, despite the absence of any evidence of wrongdoing, and if that coercive sequestration, to force Todashev to forge the chains of his own imprisonment, was the ultimate goal of the weeks-long project of the four officers, then the Constitution was violated.

*Chavez v. Martinez*, 538 U.S. 760 (2003) involved the coercive questioning of a suspect who was in the hospital being treated for bullet wounds. He was already under arrest as a result of a shooting incident in which he pointed a firearm at the officers. The coercive interrogation was not a means to try to place him in custody, as it clearly was here. Each of the officers played a role in putting Todashev in that situation. And *Chavez* does not stand for the proposition that the officers were blameless, rather, the Court sent the case back to the trial court to examine whether the plaintiff's due process rights were violated. *Id*. at 779-80.

The facts in this case are not dissimilar to the facts in *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), where federal officers entered the plaintiff's apartment and made a Fourth Amendment seizure without probable cause. Although here the officers entered with consent, Todashev soon found himself not free to leave although hours passed without anything that could pass for probable cause if, in fact, probable cause was ever perfected. The USA is still secretive about that.

**D. Plaintiff Has Demonstrated Specific Facts Supporting Conspiracy**

Plaintiffs under 42 U.S.C. § 1985 must allege with particularity the elements of a claim based on a conspiracy to deprive persons of their rights or privileges. Although an action under 42 U.S.C.A. § 1985 requires two or more conspirators, the statute provides that the action may be brought against any one or more of them; therefore, a complaint alleging that "defendants and other unnamed conspirators" deprived the plaintiff of the equal protection of the law is sufficient to withstand a motion to dismiss where the complaint specifies one of the conspirators. *Milner v. National School of Health Technology*, 409 F. Supp. 1389 (E.D. Pa. 1976). 15 Am. Jur. 2d Civil Rights § 180. Defendant Cinelli concedes that the participants, including himself and Defendant Gagne, met and planned the operation prior to first contact. (Exhibit B, Interview with Curtis Cinelli, 6:11-18). Plaintiff further shows as follows:

    a.  Savard set up and participates in 4/21/13 unlawful detention;

    b.  Savard set up surveillance and seizures by local LEO

    c.  Savard set up second unlawful detention

    d.  Savard and Gagne guarded exit from apartment;

    e.  Savard ordered Todashev's friend to leave the area;

    f.  Cinelli and Gagne followed and monitored Todashev;

    g.  Cinelli and Gagne set up sequestration;

    h.  McFarlane shot Todashev in the back as he tried to leave

It is ironic that Defendants are complaining of not being put on notice of what they did when they claim to hold actual video and audio recordings of what went on. In any case, Plaintiff can further amend to show the inter-relationship of the actions of each Defendant and how it fit into the common plan.

### E. Plaintiff Has Adequately Shown A Failure to Intervene

A jury could find an officer who neither ordered nor participated in a use of excessive force liable for the violation. *Priester v. City of Riviera Beach, Fla*., 208 F.3d 919, 925 (11th Cir. 2000). That a police officer had a duty to intervene when he witnessed the use of excessive force [by another officer] and had the ability to intervene was clearly established in February 1994. *Id*. at 924.

It was highly improbable that the first volley of shots killed Todashev and we should not conclude whether the officers outside had an opportunity to intervene without discovery and a completed record. The unreported case cited by Defendants, *Militello v. Sheriff of the Broward Sheriff's Office*, 684 F. App'x 809, 813 (11th Cir. 2017) as standing for the proposition that "an officer not in the room is in no position to intervene," (Doc. 36 at 24) was also decided on a motion for summary judgment, after the discovery process had taken place and a completed record had been placed before the court. The representation that this case states, as a matter of law, that an officer outside a room cannot intervene when needed, is also disingenuous and a bit dishonest.

There is no indication that there were any loud noises accompanying the use of force in the above case, or how far away the officers accused of failure to intervene were from the site of the use of force (although it appears they were in another part of the jail). *Militello,* 684 F.Appx. at 811. It is also of note that this case involved video which was produced in discovery and made available to the court prior to the decision being made.[9]

Defendants also cite *Riley v. Newton*, 94 F.3d 632, 635 (11th Cir. 1996) to say that a defendant could not have been expected to intervene in "a sudden and unexpected use of force" where he had "no reason to expect fellow officer would discharge weapon." The facts alleged in this case are to the contrary. Plaintiff alleges the officers all had the expectation that a seizure was about to occur.

## F. Defendant Savard Was Kept Aware of the Events Inside the Apartment and Had the Ability to Intervene to Save Mr. Todashev's Life

A jury could find an officer who neither ordered nor participated in a use of excessive force liable for the violation. *Priester v. City of Riviera Beach, Fla*., 208 F.3d 919, 925 (11th Cir. 2000). That a police officer had a duty to intervene when he witnessed the use of excessive force [by another officer] and had the ability to intervene was clearly established in February 1994. *Id*. at 924.

---

[9] Plaintiffs cite still another case, this one from the Second Circuit, Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 205 (1st Cir. 1990), that was decided on summary judgment on a completed record, again implying that the case was decided as a matter of law.

Defendants Gagne and Cinelli maintain that "if the second officer did not see the excessive force used or did not have the opportunity to intervene in the excessive use of force, he or she is not liable." (Doc. 37, p. 8). The latter part is admittedly true, but Defendants have given no authority for the proposition that "if the second office did not see the excessive force used . . . he or she is not liable." Defendants McFarlane and Savard have elsewhere cited an unreported case, *Militello v. Sheriff of the Broward Sheriff's Office*, 684 F. App'x 809 (11th Cir. 2017) where officers in another part of the jail were not liable for a use of force where there was no notice (no sounds nor any reason to expect violence), *Id.* at 811). That case was also decided on a motion for summary judgment, after the discovery process had taken place and a completed record had been placed before the court. That scenario does not square with the facts in this case.

There is no indication that there were any loud noises accompanying the use of force in the above case, or how far away the officers accused of failure to intervene were from the site of the use of force (although it appears they were in another part of the jail). *Militello*, 684 F.Appx. at 811. Here, at least Cinelli was still in the apartment with McFarlane. Gagne was just outside, along with Savard.

The question of "ability" to intervene depends on what is expected as intervention. Does an officer have to physically grapple with his fellow officer using or preparing to use excessive force or merely tell him or her to stop? If the

latter, then time and distance are less daunting.

In any case, taking the Fourth Amendment violation as a whole, including the sequestration of Mr. Todashev by the officers, all of them played a role. The officers monitored and followed Todashev through the apartment, even watching him urinate and describing how he did so in a subsequent interview. Todashev was forbidden to leave to buy cigarettes. Just before the shooting, Gagne went outside and Savard told Todashev's friend, Khusen Taramov, that he had to leave. The officers thus had Todashev boxed in and given the fact that he was being followed around his apartment, he would have known it. It should be kept in mind that Trooper Gagne had stated Todashev was only a "person of interest" and that he had "nothing concrete" at the outset. (Exhibit A, Gagne Interview, 5:1-3).

### G. Plaintiffs Require Discovery under Rule 56(d)

Plaintiff cannot fairly counter all the selective allegations of fact that appear in between the abundant redactions and withheld records without full and fair discovery according to the normal application of the Rules.

Fed.R.Civ.P. 56(d) provides:

(d) When Facts Are Unavailable to the Nonmovant. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

Undersigned counsel declares under penalty of perjury that without

unhampered discovery he cannot present all the facts necessary to fully and fairly

litigate this case on the merits. (Exhibit M, Declaration of James Cook).

**H. Conclusion**

Based on these arguments and citations to authority, Plaintiff asks this

Honorable Court to DENY this Pre-Discovery Motion for Summary Judgment.

Respectfully Submitted,                *s/James V. Cook*_____
                                       JAMES V. COOK
                                       Florida Bar Number 966843
                                       Law Office of James Cook
                                       314 West Jefferson Street
                                       Tallahassee, FL 32301
                                       Fax: 850 561-0836

                                       THANIA DIAZ CLEVENGER
                                       Florida Bar No. 97301
                                       E-mail: tclevenger@cair.com
                                       CAIR Florida, Inc.
                                       8076 North 56th Street
                                       Tampa, Florida 333617
                                       Telephone: (813) 514-1414

                                       TARK AOUADI
                                       Florida Bar No. 0671223
                                       E-mail: taouadi@cairflorida.org
                                       CAIR Florida, Inc.
                                       1507 S. Hiawassee Road, Suite 212
                                       Orlando, Florida 32835
                                       Telephone: (407) 490-0407

                                       ATTORNEYS FOR PLAINTIFF

I CERTIFY a true copy hereof was served 2/26/18 on all counsel of record
registered with the CM/ECF electronic filing system.

                                       */s/James V. Cook*