

# REPORT ON THE DEATH OF IBRAGIM TODASHEV
# CIVIL RIGHTS DIVISION
# UNITED STATES DEPARTMENT OF JUSTICE
# MARCH 25, 2014

U.S. Department of Justice Civil Rights Division
Report on the Death of Ibragim Todashev
March 25, 2014


I.      **Summation**

       The United States Department of Justice has determined that the evidence does not reveal a violation of the applicable federal criminal civil rights statutes or warrant further federal criminal investigation of the May 22, 2013 death of Ibragim Todashev, who was shot in an Orlando, Florida apartment by an FBI Agent during the investigation of Todashev's role in a 2011 Waltham, Massachusetts triple homicide.

       From the evening of May 21, 2013 into the early morning hours of May 22, a Massachusetts homicide investigative team - a Boston FBI Special Agent ("the Agent") and two Massachusetts State Police homicide investigation troopers ("the Lead Trooper" and "the Assisting Trooper") - interviewed Todashev on the ground floor of Todashev's residence, an Orlando apartment. During the interview, Todashev confessed his complicity in the murder of three men in Waltham, Massachusetts in 2011. At the time of the interview, the Massachusetts Investigative Team knew Todashev to be a skilled mixed martial arts fighter with a recent arrest history for violent behavior. As Todashev began to write a statement detailing his role in the murder, he suddenly struck the FBI Agent with the coffee table he was writing on and ran to the kitchen area. The Agent, who sustained a serious head wound, drew his handgun. Todashev ignored commands to show his hands, armed himself with an approximately five-foot long, hollow, metal utility pole, and charged back toward the Assisting Trooper and the Agent. Other available evidence is consistent with the eye-witness law enforcement officers' accounts that, fearing that Todashev intended to seriously injure or kill someone, the Agent fired two volleys, striking Todashev with seven shots causing Todashev's death.

       A thorough inquiry and review into the shooting has been conducted by experienced prosecutors from the Civil Rights Division and the United States Attorney's Office for the Middle District of Florida ("USAO"), and by agents with the FBI Inspection Division. The inquiry included reviewing all witness accounts, physical evidence and the results of forensic analyses, audio/video recordings and electronic communications, other reports generated by the FBI, the Office of the State Attorney for the Ninth Judicial Circuit of Florida, and the District Nine Medical Examiner's Office. A senior Civil Rights Division prosecutor participated in the interview of critical witnesses and consulted with the forensic experts and prosecuting authorities in Florida and Massachusetts, as well as the attorneys representing Todashev's family. After reviewing all available evidence, the Civil Rights Division and the USAO have concluded that the evidence does not reveal a violation of federal criminal civil rights statutes or warrant further federal criminal investigation.

       To establish a violation of 18 U.S.C., Section 241 and 242, the applicable federal criminal civil rights statutes, the government must prove, beyond a reasonable doubt, that an official, acting under color of law, willfully deprived a person of a right protected by the Constitution or laws of the United States or conspired to do so. In prosecuting a violation of Section 241 or 242, the government must show that the official conspired to use or used unnecessary and unreasonable force that was not warranted. The government must also prove,

U.S. Department of Justice Civil Rights Division
Report on the Death of Ibragim Todashev
March 25, 2014

beyond a reasonable doubt, that the official acted willfully, that is, with the specific intent to do something the law forbids. This requirement is the highest standard of criminal intent imposed by the law. As this requirement has been interpreted by the courts, evidence that an agent may have acted out of fear, mistake, panic, misperception, or even poor judgment cannot establish the high level of intent required under Section 241 or 242.

The Department has concluded the evidence does not reveal a prosecutable violation of those federal criminal statutes and that further inquiry would not change this conclusion.

## II.    **Background**

Three men were robbed and murdered, and left with their throats slit, in Waltham, Massachusetts on September 11, 2011. Todashev had been a resident of the Boston area in 2011. He was a mixed martial arts enthusiast and had participated in fighting competitions, some of which were posted on YouTube. Todashev and deceased Boston Marathon bombing suspect Tamerlan Tsarnev were acquainted during this time period. Both shared an interest in the mixed martial arts. Both men were suspected to have been involved in the Waltham murder.

In May 2013, the Massachusetts Investigative Team traveled to Orlando where Todashev was then living. A local law enforcement Task Force Officer ("the Task Force Officer") assisted by initially interviewing Todashev for the Massachusetts Investigative Team. That interview revealed further information to bolster the suspicion that Todashev had been involved in the triple homicide. The Massachusetts Investigative Team returned to Massachusetts. Soon thereafter, they learned that Todashev had booked a flight to Russia scheduled to depart on May 24. The Massachusetts Investigative Team decided to return to Orlando to interview Todashev personally about the homicides before he left the country.

Todashev had an arrest record for assaultive behavior. In 2010, he was arrested in Boston for disorderly person and resisting arrest. In 2012, Todashev was accused of assaulting another man in an Osceola County, Florida bar. On May 4, 2013, he was arrested in Orlando for aggravated battery. In this latter incident, Todashev allegedly fought two men, knocking one unconscious. The Massachusetts Investigative Team was aware of Todashev's arrests for assaultive conduct, knew from his gym associates that he was known as a tenacious martial arts fighter, had viewed the YouTube postings of his mixed martial arts competitions, and strongly suspected his involvement in the brutal 2011 triple homicide.

On May 21, the Massachusetts Investigative Team had their local law enforcement contact, the Task Force Officer, to ask Todashev to provide a further interview. Todashev refused to go to a police station for the interview but agreed to meet at the Orlando apartment in which he lived. It was decided that all three members of the Massachusetts Investigative Team should be present during the interview while the Task Force Officer remained outside.

U.S. Department of Justice Civil Rights Division
Report on the Death of Ibragim Todashev
March 25, 2014

Todashev, accompanied by a friend, met the investigators at about 7:30 p.m. on May 21 in front of the two-story apartment. The Task Force Officer introduced Todashev to the others and Todashev agreed to speak with the Massachusetts Investigative Team inside the apartment. Todashev's friend waited with the Task Force Officer at first, but then left the area well before midnight and did not return. The Task Force Officer remained outside the apartment while Todashev and the three investigators spoke inside for approximately four hours.

III.   **Summary of May 21-22 Evidence**

At the time of the shooting, only the Agent and the Assisting Trooper were inside the apartment with Todashev. The Task Force Officer and Lead Trooper, who were outside the apartment when the shooting occurred, entered immediately after the shooting. Additionally, three neighbors witnessed some corroborative conduct at the time of the shooting. While there are audio/video recordings of the interview of Todashev earlier that evening, there are no recordings of the shooting. All witness accounts are consistent with each other and are corroborated by the physical and forensic evidence. And, no physical or forensic evidence contradicts the witness accounts.

The Agent and the two troopers engaged Todashev in conversation inside the apartment for approximately four hours. The Massachusetts Investigative Team members' accounts of the interview are consistent with audio/video recordings made contemporaneously by the troopers. Todashev was polite, calm, articulate, and, at the same time, reticent. He never asked the investigators to leave or to discontinue the interview.

Balancing between the competing factors of developing an amicable rapport conducive to gaining information and the potential risk presented by a murder suspect in the freedom of his own residence, the Massachusetts Investigative Team did not initially search Todashev's person or the apartment for weapons.

A.   Witness Accounts, Text Messages and Video

The first floor consisted of two rooms; a living room and a kitchen between which there was a counter, permitting viewing from one room into the other (see Attachment A, a diagram of the first floor and items present after the shooting). A small hallway, accessing the front outside door, ran from the living room next to the kitchen with an entryway between the hallway and the kitchen. At the other end of the apartment was a sliding glass door that led directly outside. A stairway led to the upstairs bedroom and bathroom. Significantly, the investigative team was aware that an approximately four-foot long sharp metal-bladed sword was hanging on the stairwell post in the living room.

The interview was conducted in the living room while Todashev stood or sat on a bed mattress in front of the sliding door in the back of the room. During the lengthy interview, the investigators permitted Todashev to move around the apartment, drink water, smoke cigarettes, and take bathroom breaks upstairs. While Todashev smoked, he opened and closed the unlocked sliding door to the outside to ventilate the room.

U.S. Department of Justice Civil Rights Division
Report on the Death of Ibragim Todashev
March 25, 2014

Initially, Todashev was not completely forthcoming.  As the conversation developed, he proffered that he had direct knowledge of the 2011 triple homicide.  At 10:25 p.m., Todashev verbally "waived his rights" and signed a Miranda form acknowledging his understanding of his right to be represented by an attorney and willingness to speak at that time without an attorney.  In response to continuing questioning, he hesitantly, but indisputably, admitted complicity in the murders.  The verbal confession was recorded on the troopers' recording devices.[1]

More than one recording device was activated at different times by the troopers as either the memory capacity or the battery power of a particular recording device diminished during the course of the interview.  Also, one trooper was using his cell phone both to record parts of the interview and to send text messages to other law enforcement officials.

As midnight approached, Todashev agreed to write a statement to memorialize his verbal confession and to provide extenuating and mitigating facts that he felt explained his conduct.  Because the interview discontinued when Todashev began to write his statement, the Assisting Trooper shut off the recording device on his cell phone and was sending a text message to other law enforcement officers.  Thus, no recorder was activated at the time of the shooting.

The last segment of video recording depicts Todashev sitting on the mattress (see Attachment A) next to the outside sliding glass doors.  He is beginning to write on a paper tablet, using a coffee table as a writing surface.  The coffee table is positioned next to the mattress between it and the kitchen.  The Lead Trooper is sitting on a folding chair between Todashev , who is sitting behind the coffee table, and the kitchen.  As the recording ends, the Assisting Trooper is moving toward the recording device and shutting it off.

During the evening, the troopers had been updating a Middlesex County, Massachusetts, Assistant District Attorney ("the ADA") on the progress of the interview by cell phone and text message.  The ADA was waiting at his office in Massachusetts to prepare an arrest warrant if necessary.  When the Assisting Trooper shut down his recording, he noticed that, while he had been recording with that cell phone, the ADA had texted the troopers a message:  "Don't put him in custody until we get a warrant."  The Lead Trooper went outside to consult with the ADA by cell phone.  Accordingly, only two law enforcement officers were watching Todashev at this point in time.

As Todashev wrote his statement, the Agent and the Assisting Trooper noticed a change in Todashev's behavior.  Todashev nervously looked around and became more deliberate in his speech and movement.  Todashev again asked to go to the bathroom.  The Agent/Assisting Trooper patted Todashev down.  The Agent accompanied Todashev to the upstairs bathroom.

---

[1]  Because the investigation of the triple murder continues, the Middlesex County, Massachusetts District Attorney has requested that the details provided in Todashev's confession not be made public at this time.  To preserve the integrity of that continuing homicide investigation, we honor that request.

U.S. Department of Justice Civil Rights Division
Report on the Death of Ibragim Todashev
March 25, 2014

The Assisting Trooper watched from the staircase.  The Agent and Assisting Trooper observed that Todashev did not need to urinate or otherwise use the bathroom.  According to them, Todashev washed his hands in a slow, methodical manner, appearing preoccupied.  As Todashev began to walk back downstairs, he slowed his pace on occasion almost to a stop.  The Agent and Assisting Trooper were concerned about the changed behavior.

As Todashev started back down the stairs with the Agent, the Assisting Trooper moved quickly to remove the sword that was hanging on a post at the bottom of the stairwell.  He hid it behind a three-foot tall shoe rack in the hallway between the living room and kitchen.  A mirror situated at the foot of the stairs permitted someone on or at the top of the stairs to see into the hallway.  The Assisting Trooper suspected that Todashev had seen the Assisting Trooper moving the sword toward the hallway and kitchen, by looking in the mirror as Todashev descended the stairs.

After the bathroom break, the Agent sat in the folding chair facing the coffee table and the mattress on which Todashev was seated.  The Assisting Trooper was at the stairway.  Behind Todashev on the other side of the mattress was the sliding glass door, the closest avenue of potential escape.

As Todashev resumed writing the statement, the Assisting Trooper texted a message transmitted from his cell phone at 12:03 a.m. to the other investigators.  It read, "Be on guard. He is in vulnerable position to do something bad.  Be on guard now.  I see him looking around."  The Assisting Trooper looked down at his cell phone to watch for the electronic queue that the text message had been communicated.  The Agent was sitting on the folding chair reading his notes.  At that instant, the Agent and Assisting Trooper were momentarily distracted.

The Assisting Trooper heard a loud noise, which he later assumed to be a yell by Todashev.  The Assisting Trooper saw Todashev spring up from the mattress and push the coffee table into the air.  He was uncertain whether the table struck the Agent.  Todashev ran toward the hallway.  The Assisting Trooper yelled for his partner, the Lead Trooper, who was outside.  The Assisting Trooper saw Todashev quickly move toward the kitchen, making no effort to open the front door to escape.  The Assisting Trooper believed Todashev had seen him remove the sword from where it was hanging and that he was looking for the sword or another weapon in the kitchen.

The Agent felt something strike him in the backside of the head.  He was knocked from the chair.  He saw Todashev run past him toward the hallway.  The Agent drew his handgun.  The Agent was dazed from being hit by the table and suffered a severe head laceration which later required nine staples to close.  He saw Todashev through the opening above the kitchen counter and heard metal banging as if Todashev was searching for something.

According to both the Agent and the Assisting Trooper, Todashev refused to comply with commands to show his hands.  The Assisting Trooper saw Todashev grab a metal utility pole from the corner next to the front door.  While the Assisting Trooper attempted unsuccessfully to draw his handgun, Todashev raised the pole over his head, holding it with both hands in "a

6

U.S. Department of Justice Civil Rights Division
Report on the Death of Ibragim Todashev
March 25, 2014

trained fighting position" as he charged at the Assisting Trooper.  The Assisting Trooper raised his arms up in front of his face to block an impending blow.  According to the Assisting Trooper, he expected to be "impaled" by the pole.

The Assisting Trooper heard a volley of gunfire from his right.  He saw the gunfire strike Todashev and Todashev fall to, or partially to, the floor, then quickly regain his footing and lunge toward the Assisting Trooper.  The Assisting Trooper estimated that Todashev's body was coming back at them at a 45 degree angle from the floor.  He heard a second volley of gunfire.  The Assisting Trooper saw the impact of the bullets twist Todashev's body back and forth.  He thought he heard three or four shots in each volley.  The Assisting Trooper further declared that, had he been able to draw his handgun in time, he "absolutely" would have shot Todashev because the Assisting Trooper feared for his own life.

Just before the shooting, the Agent was standing a few feet to the right of the Assisting Trooper on the kitchen side of the living room.  He saw Todashev quickly turn the corner between the kitchen and hallway and come rapidly toward the Agent and Assisting Trooper.  The Agent did not know whether the Assisting Trooper had his gun out.  But, having heard the sound of metal banging as Todashev appeared to search for something in the kitchen, the Agent assumed that Todashev was armed with something.

The Agent stated that, as Todashev moved toward them to "attack," the Agent fired a volley of gunshots.  The Agent saw Todashev fall backwards when he was struck by the gunfire, but quickly regain his footing and lunge forward toward them.  The Agent fired a second volley.  The Agent said that he shot Todashev because he feared for the Assisting Trooper's and his own life.

The Lead Trooper and the Task Force Officer heard a commotion inside the apartment and then two gunshot volleys, one quickly after the other.  The Lead Trooper heard his partner's call for help, unintelligible yelling, and what he thought were three or four shots in each volley.  The Task Force Officer, an experienced firearms and SWAT officer, reported "distinctly" hearing three shots in the first volley and four shots in the second volley.  The ADA said that he and the Lead Trooper were talking around midnight when the Lead Trooper abruptly terminated the call.

Neighbors in three nearby apartments were home on the evening of May 21-22 and witnessed relevant conduct.  One neighbor came home from work about 10:30 p.m. and noticed lights on inside Todashev's apartment and that the blinds on the sliding glass door were open, which was unusual.  He further reported that he saw several males inside at that time.  That neighbor was later watching television at about midnight when he heard four loud "pops," followed by three loud "pops."  He then saw several individuals hovering over "something" on the floor.  The neighbor believed the noise was attributable, however, to construction across the lake from their apartment complex.

Two other neighbors heard what they thought were gunshots about midnight.  One neighbor thought she heard two shots and loud banging.  When she looked outside, she saw a

7

U.S. Department of Justice Civil Rights Division
Report on the Death of Ibragim Todashev
March 25, 2014

man talking on a cell phone.  The third neighbor heard a noise "like a gunshot" about midnight but did not know the location of the noise or observe anything unusual.

The Lead Trooper and the Task Force Officer immediately entered the apartment through the front door after they heard the gunshots.  They saw Todashev's body lying stomach-down on the hallway floor with his head pointed toward the living room.  A red metal utility pole was partially underneath Todashev's body, extending out in front of Todashev's head.  They believed Todashev was dead.  The Assisting Trooper immediately confirmed that Todashev had no pulse. Less than five minutes after the Assisting Trooper sent his "be on guard" text message, the Task Force Officer called 911 to report the shooting.

B.    Physical Evidence

The FBI Evidence Recovery Team and Florida's District Nine Medical Examiner's Office investigators processed the scene, took photographs, and collected physical evidence in the apartment after the shooting.  This evidence corroborates much of the information in witness accounts.  None of the physical evidence contradicts the witness accounts.

The paper tablet with Todashev's incomplete written statement lay on the floor of the living room (Attachment A, Item 1) between the mattress on which Todashev had been sitting and the chair in which the agent had been sitting.  It consisted of a half page of handwritten information that corroborated some of what Todashev admitted in the audio/video recordings regarding the triple homicide.  The last sentence that Todashev wrote on the tablet of paper specifically related conduct by him that acknowledged complicity in the crime.[2]

The lower shelf of the broken coffee table (see Attachment A, table shelf) was located near the chair in which the Agent had been seated.  That shelf was disconnected from the rest of the coffee table (see Attachment A, table base) that was on the floor beyond the chair and closer toward the kitchen.  Blood stains were on both parts of the coffee table.

Todashev's body was stretched out on his stomach at the intersection of the hallway and the living room with both feet oriented toward the front door (see Attachment A).  After the body was moved for preparation for transport to the medical examiner for autopsy, a single bullet projectile was discovered on the floor in a puddle of blood in the living room in the vicinity where the body had been later moved.  The projectile was not present prior to the body having been moved there.

An approximately five-foot long, red, hollow metal pole (see Attachment A, pole) was partially underneath the body, extending out from the body next to the head into the living room. It was oriented parallel to the length of the body.  The metal of the hollow pole was bent and compressed near both of its ends.  The sword (see Attachment A, sword) was jammed between a shoe rack and the wall of the hallway near the body.  Seven spent cartridge casings (see

_____

[2]  The Massachusetts District Attorney has asked that we not relate the statement's contents because of her continuing investigation of the triple homicide.

U.S. Department of Justice Civil Rights Division
Report on the Death of Ibragim Todashev
March 25, 2014

Attachment A, Items 2 through 8) were in the living room on the kitchen side between the chair and the kitchen.

Accordingly, the physical evidence corroborates certain critical facts from the witness accounts:

First, the table was broken into two parts, with blood stains on each separated part. It was found at a location consistent with the Assisting Trooper's contention that he saw the coffee table propelled in the direction of the Agent. Additionally, its blood-stained condition was consistent with the fact that it had struck and cut the Agent in the head.

Second, Todashev's body was located in a place on the floor and in a position and alignment that was consistent with the account of both the Agent and the Assisting Trooper that Todashev was moving toward them and then fell forward after being shot.

Third, the pole was found beneath the body generally aligned with the length of the body. Additionally, the hollow pole was bent and compressed at both ends, several inches away from each end, in a pattern as though it had been squeezed by an adult's hands. The location of the pole under the body and the placement of the two bend marks are consistent with the Assisting Trooper's account that Todashev charged holding the pole with both hands and fell on the pole after being shot.

Fourth, the spent casings were found in a location that is consistent with the Agent's and the Assisting Trooper's accounts of the Agent's position in the living room when the Agent fired at Todashev. And, the seven spent casings are consistent with the witness accounts that estimate two volleys of three to four shots.

Finally, the sword was not hanging on the empty screw-like hangers. Rather, it was jammed in between the shoe rack and the wall in the hallway and not readily visible. These facts are consistent with the Assisting Trooper's statement that the Assisting Trooper moved the sword there in order to hide it from Todashev.

C.     FBI Lab Analyses

The FBI Lab conducted forensic analyses on several relevant items of physical evidence: the Agent's handgun, bullet projectiles, spent shell casings, the metal pole, the sword, the broken coffee table, the Agent's shirt and jacket, and the paper tablet on which Todashev wrote. The results of the forensic analyses were consistent with facts related in the witness accounts.

The seven projectiles (six removed from Todashev's body during the autopsy and one recovered at the scene) were all fired by the Agent's handgun. The seven spent shell casings were ejected by that same weapon. This is consistent with the Agent's and the Assisting Trooper's accounts that only the Agent fired at Todashev.

U.S. Department of Justice Civil Rights Division
Report on the Death of Ibragim Todashev
March 25, 2014

No latent fingerprints viable for comparison were found on the metal pole. One viable latent print was found on the blade of the sword. That latent print did not match the known prints of either Todashev or any of the Massachusetts Investigative Team and it did not have sufficient points of comparison to compare it to any known fingerprint data base.

However, fingerprints and a palm print were found on the tablet of paper on which Todashev wrote his incomplete statement. All prints matched Todashev's known prints. This forensic evidence, in conjunction with the video recording depicting Todashev writing on a tablet on the coffee table, corroborates that Todashev authored the written confession.

DNA was extracted from blood on the coffee table and its detached shelf and from the Agent's shirt and jacket, upon which the Agent bled profusely from his head wound. The DNA from the blood on the Agent's shirt and jacket matched the DNA from the blood on both sections of the coffee table. At the same time, Todashev's DNA was excluded as a contributor to any of this DNA. This forensic result is consistent with the Agent being struck in the head by the coffee table or bleeding on it later.

D.    Autopsy Report and Medical Examiners' Interviews

Florida's District Nine Medical Examiner's Office conducted an autopsy on May 22, 2013. The Chief Medical Examiner and the Deputy Chief Medical Examiner, who conducted the autopsy, later discussed their findings with FBI Inspectors and a Civil Rights Division attorney. The medical examiners provided certain conclusions to a scientific certainty. They also proffered relevant observations. When considered in conjunction with all available evidence, these conclusions and observations support reasonable inferences that are consistent with the witness accounts of the shooting.

According to the medical examiners, Todashev died as a result of multiple gunshot wounds. The results of the autopsy were consistent with Todashev falling forward toward the shooter with his head down. The shooter was neither standing over Todashev nor behind him when the shots were fired.

Todashev suffered gunshot wounds from seven bullets.[3] None of the seven entrance wounds showed soot or stippling. Thus, there was no evidence of a contact or close to contact gunshot. Rather, as the autopsy report reported, the wounds were fired from an "indeterminate range." The order in which the seven initial entrance wounds were inflicted cannot be determined to a scientific certainty. Those seven entrance wounds did, however, separate into groupings or patterns that suggest how and when they may have been inflicted.

The first grouping consists of three entrance wounds that struck Todashev on the left front upper side of his body. The bullets that caused those wounds all followed a slightly left to

---

[3]    Four bullets entered but did not exit. Two bullets, which initially entered the left arm, exited the inside of that arm and re-entered into the left side of the chest, creating three holes each. One bullet entered the back of the torso and exited the front, creating two holes.

U.S. Department of Justice Civil Rights Division
Report on the Death of Ibragim Todashev
March 25, 2014

right and a front to back trajectory through and across the front of the body. One bullet in this grouping entered the upper left side of the chest. The other two bullets in this grouping entered the outside of the upper left arm, exited at the inside of that arm, and then reentered the body again in the upper left side of the chest near the first described wound.

Four other entrance wounds formed into different and separate patterns. Two of these entrance wounds struck the top of Todashev's body, one into the crown of the left side of his head and the other into the top of his left shoulder. The other two entrance wounds struck Todashev in the middle right side of his back, with one exiting through the front. All four of these bullets also followed a lateral trajectory through the body consistent with the trajectory direction of the bullets in the first grouping.

The bullets in these other two patterns also followed an up-to-down and back-to-front trajectory through the body. Significantly, the bullet that entered the crown of the left side of the head and the bullet that entered the top of the left shoulder both followed an extreme downward trajectory through the body (from the head and shoulder almost directly toward the legs). The two bullets that entered the back, however, followed a back-to-front trajectory with a much less extreme downward trajectory.

The medical examiners' observations about the location of the seven entry wounds and the trajectory of the associated seven bullets through the body support two important conclusions. First, the trajectory of all the bullets through the body indicates that all seven shots were fired from the direction that the Agent and the Assisting Trooper claim that the Agent was positioned in relation to Todashev when he fired at him. Second, the shots were fired at an indeterminate range, not at contact or close to contact range. Thus, these two conclusions, when considered together and with all the other relevant evidence (particularly the location of the body on the floor and the observation that Todashev fell forward toward the shooter, who was not over him or behind him) are consistent with the two eyewitness accounts that the Agent fired from the living room while he was in front of and to the kitchen-side of the living room as Todashev advanced toward the law enforcement officers from the hallway.

The medical examiners' observations about the location of the seven entry wounds and the trajectory of the bullets through the body support other significant reasonable inferences:

First, the separate grouping and patterns of entrance wounds are consistent with the account of all the witnesses, the two eye witnesses, the two witnesses outside and the one neighbor, who heard two separate volleys.

Second, the wounds and trajectory of the first grouping – entry wounds to the left upper chest and left upper arm area – are consistent with the first volley, that the Assisting Trooper reported was fired as Todashev charged with the metal utility pole held over his head. Moreover, these three entry wounds would have been inflicted by the Agent shooting from the kitchen side of the living room as he claimed.

11

U.S. Department of Justice Civil Rights Division
Report on the Death of Ibragim Todashev
March 25, 2014

Third, two of the wounds that form the second pattern, one to the crown of the left side of the head and the other to the top of the left shoulder – both with an extreme downward trajectory – are consistent with the Assisting Trooper's account that Todashev was shot with a second volley, after he had fallen down, regained his footing, and lunged at the trooper at an approximately 45 degree angle.  The medical examiners further supported this inference by their observation that those two wounds could "likely" have occurred when Todashev was "falling."  It is a fair inference that a body could be at a 45 degree angle to the ground both when it is falling as well as when rising.

Finally, the two entry wounds to the back – with a much less extreme downward trajectory angle – are consistent with the Assisting Trooper's observation that Todashev's body was twisting around as he was shot and fell, thus striking him in the back.  The medical examiners further observed that those two wounds could "likely" have occurred as Todashev was twisting his body.

These observations, particularly the trajectory of the head and shoulder wounds considered along with the combination of seven entrance wounds and associated bullet trajectories, are inconsistent other possible scenarios.  First, the three wounds to front chest area could not have been inflicted while Todashev had his back to the shooter.  Second, the extreme downward trajectory of the wounds to the crown of the head and the top of the shoulder are inconsistent with the shots being fired when Todashev had his back to the shooter or was running away.  Significantly, the medical examiners observed that the results of the autopsy were consistent with Todashev falling forward toward the shooter with his head down.  Again, it is a fair inference that Todashev could have been falling or rising with his head down.

Other conjectured scenarios are not plausible enough to raise doubts about the mutually consistent accounts of the witnesses and the physical evidence that corroborates the witness accounts.

In sum, the existing wounds and associated bullet trajectories, when taken as a whole and considered in conjunction with all the other available evidence, are consistent with the only eyewitness accounts, those of the Assisting Trooper and the Agent.  Further, nothing about the medical opinions and observations contradicts those eyewitness accounts.

     E.     <u>Information Provided by Todashev's Family Attorneys, his Father, and CAIR</u>

     1.     <u>Conversation with his Father, Alibi and Physical Capacity</u>

Attorneys representing Todashev's family asked the Department to consider three potentially relevant facts.  First, Todashev called his father, who was in Russia, and told his father that he planned to speak with law enforcement investigators because he had nothing incriminating to hide from them.  Second, there is purportedly information that constitutes an alibi for the September 11, 2011 Waltham triple homicide.  Third, knee surgery that Todashev had on March 13, 2013, rendered him physically unable to pose a threat on May 22, 2013.

U.S. Department of Justice Civil Rights Division
Report on the Death of Ibragim Todashev
March 25, 2014

If Todashev told his father that he was cooperating with law enforcement investigators, he related accurate information. He voluntarily met with investigators in Orlando earlier in May and then again with the Massachusetts Investigative Team on May 21. On the other hand, it is not surprising that Todashev did not admit complicity in a triple homicide to a parent, especially during a telephone conversation.

The attorneys for the Todashev family elected not to share the purported alibi information with the government. They advised that the witness who had the information was afraid to come forward to federal authorities. Regardless of what such a witness might offer, Todashev's confession belies whatever information might suggest the existence of an alibi. Finally, available information contradicts the contention that Todashev was so physically impaired by a prior unrelated injury to constitute a threat on May 22, 2013. Rather, the evidence suggests that he was capable of the physical activity reportedly observed by the eyewitnesses. Hospital records indicate that Todashev, an otherwise healthy 27 year-old, underwent surgery to repair cartilage and ligament damage to his right knee on March 13, 2013. The surgical repair was successful and the "prognosis was excellent." The family attorneys did not provide any medical records to reflect the progress of his recovery or his physical condition as of May 21-22, two months after the successful surgical repair of his knee.

On the other hand, we have the May 21, 2013 recording of the video confession. It depicts Todashev moving without any visible restriction. Further, on May 4, two and a half weeks before the May 22 shooting, Todashev was involved in a physical altercation in an Orlando parking lot. That incident was captured on video surveillance. It depicts that, although outnumbered, Todashev successfully fought off the two men and without any sign of physical infirmity knocked one of them unconscious, and then left in his car. The police officers, who arrested him later that day, found that Todashev appeared physically fit enough to have prevailed in the altercation – although he did caution them, when ordered to get to the ground, that he had a "bum knee." Given Todashev's martial arts skills and general physical fitness, as indicated by his fight with two men two weeks earlier, the evidence indicates that Todashev was, and would have believed that he was, physically capable on May 22 of overpowering the Agent and the Assisting Trooper.

2.      Todashev's Associates

Todashev's father wrote a letter to the President in December 2013, raising another issue that had been previously alleged by a representative of The Council on American-Islamic Relations (CAIR). Todashev's father and CAIR claim that the FBI has harassed Todashev's friends in the Orlando area, suggesting that this alleged behavior is relevant to the Todashev shooting.

As indicated previously, Todashev had a relationship with the deceased Boston Marathon bomber and, according to Todashev's uncontroverted confession, Todashev was complicit in the triple homicide. The recorded confession confirms that the law enforcement focus on Todashev was warranted. Accordingly, Todashev's associates were also the subjects of federal and state

13

U.S. Department of Justice Civil Rights Division
Report on the Death of Ibragim Todashev
March 25, 2014

law enforcement interest.  Some of those associates were questioned.  Some were incarcerated for matters unrelated to the May 22 shooting and deported pursuant to issues related to their immigration status.  Speculation that these persons were deported to conceal information is unfounded.  We learned nothing to suggest that law enforcement interaction with Todashev's associates is relevant to the May 22 shooting or that any of those persons deported had any further relevant information to offer.

## IV.   <u>Legal Analysis</u>

In order to establish a violation of 18 United States Code § 242, the government must prove beyond a reasonable doubt that a subject was acting under color of law and used excessive force when he shot or otherwise injured a victim, and that the subject did so willfully.  We also considered 18 United States Code § 241 and whether there was sufficient evidence of any conspiracy to violate Todashev's rights.  No other federal criminal statutes could reasonably be applied to this incident.

There is no question that the Agent was acting under color of law, as an on-duty FBI agent, at the time of the shooting.

Whether a subject used excessive force, in violation of 18 U.S.C. § 242, is determined under the Fourth Amendment's "objective reasonableness" standard.  <u>Graham v. Connor</u>, 490 U.S. 386, 388 (1989).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  <u>Id.</u> at 396.  Thus, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  <u>Id.</u> at 396-97.

Additionally, even if a subject's use of force could be shown to have been objectively unreasonable under the circumstances, the government must further prove that the subject acted willfully.  An act is done willfully if the act is "committed voluntarily and purposely with the specific intent to do something the law forbids, that is to say, with a bad purpose either to disobey or to disregard the law."  In order to show a violation of Section 242, a law enforcement officer's actions are willful only if he intends to do something that he knows is unlawful.  <u>Screws v. United States</u>, 325 U.S. 91, 103-04 (1945).

The evidence is insufficient to conclude that the May 22, 2013 shooting of Ibragim Todashev was either unreasonable or a willful violation of the federal criminal civil rights statutes.  Rather, considering all the surrounding circumstances, the evidence establishes that the FBI Agent fired his weapon with reason to believe that deadly force was necessary.

The materially consistent witness accounts and physical and forensic evidence corroborate the Agent's contention that he legitimately feared that Todashev intended to cause death or significant injury to the Assisting Trooper or the Agent himself.  Much of the physical

14

U.S. Department of Justice Civil Rights Division
Report on the Death of Ibragim Todashev
March 25, 2014

and forensic evidence directly supports the witness accounts of what occurred.  And, there is no physical and forensic evidence that contradicts the witness accounts.

The evidence shows that Todashev was an experienced mixed martial arts fighter capable of violent conduct.  Having just confessed to complicity in a triple murder, he had a motive to engage in the desperate act described by the Agent and Assisting Trooper.  Thus, the Agent was understandably fearful when Todashev struck him with a coffee table and then, rather than attempting to escape, found a weapon, the metal pole, and aggressively charged the Assisting Trooper with it.

Accordingly, it was reasonable for the injured Agent to believe that it was necessary to shoot in order to halt the immediate threat of death or serious bodily harm posed by Todashev's charge.  Further, it was reasonable to believe that, after a wounded Todashev regained his footing and resumed the charge, it was again necessary to shoot a second volley.

## V.    **Conclusion**

There is insufficient evidence to support any prosecutable violation of the potentially applicable federal criminal civil rights statutes, 18 U.S.C. §§ 242 or 241.  Based upon all the evidence gathered so far, there is nothing to suggest that any further inquiry would change this conclusion.  As with all matters, however, in the event that additional relevant facts should become available, the Civil Rights Division and USAO would review them and determine whether they support a re-evaluation of this conclusion.

Attachment