# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

| | |
|---|---|
| ESTATE OF IBRAGIM TODASHEV, | Case No. 6:17-cv-919-Orl-41GJK |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, et al., | |
| Defendants. | |

## PLAINTIFF'S MOTION TO ALTER OR AMEND JUDGMENT

COMES NOW the Plaintiff, HASSAN SHIBLY, through counsel, pursuant to Rule 59(e), Federal Rules of Civil Procedure, and moves this Court to Alter or Amend its Judgment to prevent manifest injustice, and would further show:

1.  Ibragim Todashev was a Russian citizen legally in the U.S. who trained at a Boston Gym with a person believed to be one of the Boston Marathon bombers, as well as with the Harvard Wrestling Team among others.[1]

2.  Mr. Todashev was a talented amateur mixed martial arts fighter who Massachusetts State Police called a "person of interest" in a drug house murder.[2] One of the state police officers said there was "nothing concrete."[3]

---

[1] Doc. 67-7, Interview with John Allen, owner of the Wai Kru martial arts gym, Boston, Massachusetts, p. 5:12-18.
[2] Doc. 67-1, Interview with Joel Gagne, p. 5:1-3.
[3] Id. at 5:1-3.

1

3. Another state police officer was quoted as calling Todashev a "suspect" but did not articulate why he suspected Todashev of criminal involvement.[4]

4. Massachusetts State Police officers, Defendant Joel Gagne and Curtis Cinelli traveled to Orlando, Florida, where Mr. Todashev lived, accompanied by an FBI agent, Aaron McFarlane, who may have thought he had information about the bombing.[5] Along with Orlando policeman Christopher Savard, they summarily detained Todashev at gunpoint searched his house, seized his electronics, and interrogated him, all without a warrant.[6]

5. Thereafter, the four set up or participated in constant surveillance of Mr. Todashev and more interrogations. They appear to have set up another detention of Todashev after he was attacked by two men in a parking lot who wanted his parking space.[7] The only witness to come forward, other than one of his attackers, was a security guard who said Todashev acted with restraint and strictly in self-defense.[8] Nevertheless, as he left the mall where the attack occurred, Todashev was arrested at gunpoint and put on the ground by Orange County Sheriff's deputies who appeared to be waiting for him.[9] FBI vehicles lined up behind the sheriff's vehicle, watching Todashev

---

[4] Doc. 67-2, Interview with Curtis Cinelli, p. 8:20-24.
[5] Doc. 67-1, Interview with Joel Gagne, p. 5:1-3.
[6] Doc. 67-3, Interview with Tatiana Gruzedeva, p. 10-23.
[7] Doc. 67-4, Interview with Christopher Savard, pp. 9:8-10:13.
[8] Doc. 67-6, Interview with Security Guard Tariq Alli, p. 3.
[9] Doc. 67-5, Interview with Deputy Anthony Riccaboni, pp. 4:1-8.

who remained calm through the ordeal.[10] Todashev never went to court because of his untimely death at the hands of the Defendants just days later.

6.    Mr. Todashev was scheduled to go back to Russia to see his parents on May 24, 2013.[11] On hearing that the Defendants wanted to meet with him one more time to clear some things up, Todashev cooperatively cancelled his flight and agreed to meet with them at his home.[12]

7.    Mr. Todashev asked that a friend of his, Khusen Taramov, be allowed to be present.[13] The Defendants agreed. However, on the evening of the meeting, the friend arrived and was told he could not go into the apartment and had to wait outside in the parking lot.[14] Later still, he was told to leave the area entirely by Orlando Policeman Savard.[15]

8.    Once the meeting started, Todashev was not allowed to leave the apartment. He was followed by the officers wherever he went, including to the bathroom, and constantly observed.[16] In the course of the interrogation, the officers began using provocative and offensive language with Todashev. At this point, Mr. Todashev would have realized he was not free to leave.[17]

---

[10] Id. at 13:3-14:7.
[11] Doc. 67-3, Affidavit of Tatiana Gruzdeva, p. 28.
[12] Doc. 67-3, Affidavit of Tatiana Gruzdeva, p. 29.
[13] Doc. 67-8, Affidavit of Khusen Taramov, p. 1:4.
[14] Id. at 1:7.
[15] Id. at 2:12.
[16] Doc. 67-9, Statement of Aaron McFarlane, p. 5.
[17] Id. at 5.

9. FBI agent McFarlane and Massachusetts state policeman Cinelli stayed in Todashev's apartment while Joel Gagne and Christopher Savard stood guard outside.[18] At some point, the men outside received a text that something bad might happen.[19] Then they heard a shout. Finally, two sets of shots rang out.[20] When they entered, Todashev was on the floor near the front door.[21]

10. Ibragim Todashev lay with his feet about one step from the front door. A red broomstick was placed length-wise under his body.[22] It bore no viable fingerprints.[23] Todashev had been shot three times in the back and once in the head. A forensic team arrived and was told to come back later.[24]

11. Massachusetts State Policeman Curtis Cinelli would later tell a state attorney's investigator that he was standing at the back of the apartment when he heard a noise and saw FBI Agent McFarlane with a bleeding head wound. He said that he drew his gun and then re-holstered it since he said he believed Todashev was leaving the apartment.[25]

---

[18] Id. at 1:4.
[19] Doc. 67-4, Interview with Christopher Savard, p. 13:12-22.
[20] Id. at 19-20.
[21] Doc. 67-1, Gagne Interview, p. 22.
[22] Doc. 67-4, Interview with Christopher Savard, p. 25:5-10.
[23] Doc. 67-11 at 10, Civil Rights Division Report.
[24] Doc. 67-10, Interview with Dan Coughlin, pp 3:11-14; 7:3-8; 8:5-7.
[25] Doc. 67-2, Interview with Curtis Cinelli, Pp. 31-32.

12. Cinelli said Todashev grabbed a broomstick next to the front door and ran at him (Cinelli) with the red broomstick in both hands over his head "like a javelin." Cinelli said he believed Todashev was trying to impale him.[26]

13. In McFarlane's version, Todashev didn't have a weapon although he might have looked for one in the kitchen. McFarlane also described Todashev as running toward the officers at the back of the apartment at "full speed."[27]

14. McFarlane said he fired seven rounds at Todashev in two sets of either three or four. After the first set, Todashev fell and then got back up again. After the second set, he fell and did not move.[28]

15. The broomstick was not found as it would have been if he was holding it over his head when he was hit.[29]

16. Despite both Cinelli and McFarlane saying Todashev was running toward the back of the apartment, his body was found next to the front door.[30]

---

[26] Id. at 23:13-18.
[27] Doc. 67-9, Statement of Aaron McFarlane, Pp. 7-8.
[28] Id. p. 8.
[29] Doc. 61-2 at 5, Cinelli Statement, "As he grabbed the pole, Todashev turned quickly toward me and raised the pole above his head with both hands." Doc. 67-2, Interview with Curtis Cinelli, pp. 24-25, "He had the broom handle up and he began to run at me. . . . The broom handle was over his right shoulder, in the air in a position as if, um, if it came and struck, it would impale someone." Doc. 75-1 at 11, Statement of Aaron McFarlane. "Todashev instantly ran at full speed from the kitchen directly towards me and Trooper Cinelli."
[30] Doc. 67-10 at 3, Coughlin Interview, "The body was face down on the floor, about three feet in from the door, right by the side of the kitchen door."

17. Two of the bullets entering Todashev's upper chest had passed through his upper arm, suggesting that he was not holding anything over his head with both hands when he was shot.[31]

18. The Defendants were highly resistant to discovery and so Plaintiff began discovery efforts by serving Fed.R.Civ.P. 45 subpoenas on the City of Orlando, the Office of the State Attorney, and the Sheriff of Orange County.

19. On April 25, 2918, before discovery requests could be responded to, the Court stayed discovery pending resolution of qualified immunity (Doc. 79).

20. On August 17, 2018, the Court granted all pending Motions to Dismiss and the government's pre-discovery Motion for Summary Judgment (Doc. 87).

21. On August 20, 2018, the Court entered Judgment in the case. (Doc. 88).

22. Plaintiff submits the Judgment is in error as follows:

    a. In its Order on the pending dispositive motions (Doc. 87) the Court speaks of "additional discovery" as if it believed some discovery had already taken place. In fact, no discovery had been produced at the time that discovery was stayed by the Court. It appears that the Court misapprehended the status of discovery at the time it was stayed.

---

[31] Doc. 67-11, n. 3, Civil Rights Division Report, "Two bullets which initially entered the left arm and re-entered into the left side of the chest." This suggests his arms were not over his head but his left upper arm was pulled into his left chest.

b. Defendants claimed to have video and audio of events before Todashev was killed. But the video was never produced to the parties or the Court.

c. The story of how Mr. Todashev was killed and what he and the officers were doing before and during the time he was killed have not been set forth in any coherent, non-contradictory form. To resolve the matter on the merits, retaining a criminalist, a ballistics expert, and a blood spatter expert would have been extremely important. Autopsy photos and scene photos should have been produced, along with videos and other evidence. This was prevented by the Court's rulings.

d. The Court drew multiple inferences in the light most favorable to the defense and against the non-moving party. The Court weighed evidence.

## MEMORANDUM OF LAW

Motions to alter or amend judgment are granted upon four basic grounds: movant may demonstrate that reconsideration is necessary to correct manifest errors of law or fact upon which judgment was based; a motion may be granted so that moving party may present newly discovered previously unavailable evidence; a motion will be granted if necessary to prevent manifest injustice; and a motion may be justified by intervening change in controlling law. *Demasse v. ITT Corp.*, 915 F.Supp. 1040 (D.Ariz.1995).

A district court has considerable discretion in deciding whether to reopen a

case in response to a motion to alter or amend judgment, but that discretion is not limitless; in any case in which a party seeks to upset a summary judgment on the basis of evidence that was not introduced on time, court must consider conflicting needs to bring litigation to an end and to render just decisions on the basis of all of the facts. *Lavespere v. Niagara Mach. & Tool Works, Inc*., C.A.5 (La.) 1990, 910 F.2d 167, rehearing denied 920 F.2d 259, *certiorari denied* 114 S.Ct. 171, 510 U.S. 859, 126 L.Ed.2d 131. Fed. R. Civ. P. 59. A motion to alter or amend may be granted where there is a need to correct clear error or prevent manifest injustice. *Firestone v. Firestone*, 76 F.3d 1205, 1208, (D.C. Cir. 1966)

The rule governing motions to alter or amend judgment does not prescribe specific grounds for granting a motion to alter or amend an otherwise final judgment. *Sanluis Developments, L.L.C. v. CCP Sanluis, L.L.C*., S.D.N.Y.2008, 556 F.Supp.2d 329. A motion to alter or amend judgment should be granted if there exists a manifest error of law or fact, so as to enable the court to correct its own errors and avoid unnecessary appellate procedures. *Kennedy v. Common-wealth Edison Co*., C.D.Ill.2003, 252 F.Supp.2d 737, affirmed 410 F.3d 365.

Rule One of the Federal Rules of Civil Procedure, states that the Federal Rules of Civil Procedure "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Despite this guiding light, the Court has lost its way.

## A. The Court Improperly Granted Defendants' Motions to Dismiss

The Court seems to impose a "summary judgment" standard on its review of the pleadings on defense motions to dismiss. At one point the Court faults Plaintiff for failing to "demonstrate" a fact, rather than plausibly plead it. (Doc. 87 at 9).

### 1. The Court Impermissibly Weighed Facts in Granting Dismissal

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). A court must, rather, act "with caution" in determining whether the matters at issue should be heard by a jury. *Id*. at 255. A jury could reasonably infer from the evidence that the actions of the Defendants violated the U.S. Constitution. Even as to the actions that were after the fact, they can serve as evidence of the intent that drove events.

### 2. The Court Selectively Excludes Key Facts from Consideration

The recounting of facts by the Court selects, ignores, and shades facts in a way that raises inferences in favor of the Defendants. For instance, the Court quotes Plaintiff as pleading (DE 48, Second Am. Compl. ¶ 27) that the FBI became interested in Todashev because of his "association" with Tamerlan Tsarnaev, one

of the Boston Marathon bombers. But Plaintiff actually said, "because he *trained at a gym* with Tamerlan Tsarnaev." Plaintiff has taken pains to note Todashev also trained with the Harvard Wrestling Club. The inference that is suggested by an "association" is more personal than that suggested by "training together."

The Court also quotes the Second Amended Complaint to say Plaintiff was questioned on April 21, 2013, and summoned for questioning on April 22, 2013 and May 15, 2013. However, the Court ignores the critical prelude when on April 21, 2013, Defendants forced Todashev to the ground at gunpoint outside his apartment, searched the apartment, arrested him, seized his electronics, and interrogated him, all without probable cause. ¶ 37-39. Defendants also turned his girlfriend over to immigration when she declined to spy on Todashev. ¶ 57-59.

The Court fails to take these illegal actions by Defendants into account and ignores that Todashev's friend who was barred from the apartment had been brought as a witness to what was supposed to be an entirely voluntary meeting. ¶ 73. These facts, together with the admission of Defendant Gagne that Todashev was, at the time, merely a "person of interest" and that Defendants had "nothing concrete," ¶ 30, are critical components of Plaintiffs case and give rise to a whole set of inferences that are key to understanding the dynamics of what comes later.

In recounting the pled facts, the Court also leaves out the important events inside the apartment leading up to the shooting. It is important to include that

officers followed Todashev everywhere in the apartment, even to the point of watching him urinate.  ¶ 77, 78. These facts belie the Court's claim that Todashev was not detained during the five-hour interrogation. They would also explain the fear and anxiety that Defendants tried to characterize as consciousness of guilt and yield an inference to explain his desire to flee the scene at the earliest time.

Also missing from the Court's facts were the many features of the known physical evidence that were inconsistent with the versions of the shooting given by the Defendants, which also differed from each other. The Court did not note that Todashev had been shot three times in the back, twice in the left arm and once in the top of the head. ¶ 90. The Defendants disagreed as to whether Todashev had a weapon or what it was. ¶ 99-103. Cinelli claimed he held a pole above his head with both arms but bullets going through Todashev's left upper arm into his left chest are inconsistent with Cinelli's scenario. ¶ 102-03.

As against the invitation of the Defendants to draw inferences in their favor, the U.S. Supreme Court decision, *Tolan v. Cotton*, 134 S.Ct. 1861 (2014), held:

> The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system. By weighing the evidence and reaching factual inferences contrary to Tolan's competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.

134 S. Ct. at 1868. *Tolan* raises nothing new; it only reinforces the Fed.R.Civ.P.

56(a) prohibition against weighing evidence and only granting summary judgment when it can truly be said that there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Id.

Courts may not resolve genuine issues of fact in favor of the party seeking summary judgment and the Supreme Court has recently emphasized that, "Our qualified immunity cases illustrate the importance of drawing inferences in favor of the nonmovant." *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014). The Eleventh Circuit Court of Appeals has noted the special demands of a death in custody:

> Because the plaintiff in this action is deceased and there is no complete witness testimony, we necessarily rely on the facts presented by the defendants, but where there is a discrepancy between the statements of the defendants, we have resolved the dispute by using only those statements most favorable to the plaintiff.

*McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009)

It goes without saying that when there is a discrepancy between the defendants' statements and the physical evidence, the same rule must apply.

### 3. Inference That Todashev Would Not Have Felt Free to Leave

The Court avoids drawing the inference that Todashev would have felt he was not free to leave by the fact that agents barred from his apartment the friend he had brought as a witness at what was supposedly a voluntary meeting, that he was followed everywhere in the apartment by one or more agents who even described in detail how he urinated. The Court cites *United States v. Opoku*, 210 F.App'x

848 (11ᵗʰ Cir. 2006) a non-precedential case from a very different factual record where agents "kept [the subject] in sight" during an interview that lasted only 45 to 60 minutes and did not reference watching the subject urinate. The Court states that Plaintiff "fails to demonstrate" that the Defendants "restrained Todashev's freedom of movement." That is not the here. The issue in *Opoku*, if it applies at all, arose on a motion to suppress in a criminal case, prior to trial. As here, the officers denied a seizure had taken place. In a motion to dismiss, a criminal defendant claiming a Fourth Amendment violation bears the burdens of proof. *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir.1998). But here, if the Plaintiff plausibly pleads and a jury could reasonably infer that Todashev would have felt that he was not free to leave, then the jury could find a Fourth Amendment seizure. This inference can come not only on the circumstances of the interrogation but also the fact of the April 21, 2013, gunpoint arrest, search, seizure, and interrogation without probable cause. (¶ 36-39). The Defendants' prior conduct creates a strong inference that Todashev would not have felt free to leave the apartment.[32]

### 4. Plaintiff Pled A Fourth Amendment Violation Against Savard

_____

[32] The Court states that "as to Plaintiff's unlawful seizure claims, the SAC is devoid of sufficient facts to state a claim for relief that is plausible on its face." However, the Court, in recounting the salient facts, failed to recognize the significance of the previous course of illegal conduct in arresting Todashev in front of his apartment, at gunpoint, and conducting an illegal search and interrogation without probable cause." (Doc. 87 at 2) It is critical to recognize the contribution of those prior incidents to any inference as to Todashev's sense that he was free to leave. Also, given that Todashev was raised abroad, he may not have known that the United States is a nation of laws, not of men – or, given his experiences with Defendants, may not have believed it.

For many of the same reasons that Plaintiff has properly pled a Fourth Amendment violation in the circumstances of the interrogation on the night of Mr. Todashev's death against the officers in the apartment and those guarding the apartment from outside, the Plaintiff has pled a case against Savard.

Defendant pled Savard was involved in the original Fourth Amendment violation of the unlawful arrest, search, and interrogation on April 21, 2013, (¶ 36-39) and by dint of his planning and failure to intervene to prevent the Fourth Amendment violation of May 22, 2013, ending with Todashev's wrongful death, Savard was liable for the violation as surely as if he had committed the violation alone. Although there was a closed door between Savard and the officers inside, there was both a text and a shout to warn Savard of harm to Todashev. Officers can be responsible for excessive force when they are in communication with those who commit a wrongful act and fail to intervene as they are able. *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 (Fla. 11th Cir. 2000) (Whether a second officer who neither ordered or participated in a use of force where the second officer was aware of the event and in voice contact with the first, was a question for a jury). Cinelli was texting from inside the apartment and Savard was in voice contact.[33]

---

[33] The Court has stated that "Because Plaintiff has failed to state a claim for unlawful seizure or excessive force, the Court need not address the Individual Defendants' argument that they are entitled to qualified immunity." Plaintiff submits that the Court misapprehended the salient factors from which an inference supporting Fourth Amendment violations could be taken, it should also be noted that qualified immunity was not due to the officer who was remote but in voice contact with the officer using force, but who failed to intervene. *Priester*, 208 F.3d at 927.

In any case, Plaintiff has pled that Savard was involved in a whole series of Fourth Amendment violations. The question is just whether Plaintiff has plausibly made an allegation that could support a reasonable inference as to any of them.

### 5. Plaintiff Has Shown an Actionable Wrong to Support Conspiracy

Plaintiff has pled a constellation of Fourth Amendment violations in this case. Again, by failing to take notice of critical pled facts that support an inference of Fourth Amendment violations by all the Defendants, the Court has blinded itself to the basis of the Count for Conspiracy. The unlawful detention on May 22, 2013, (which was set up by Savard) resulting in Mr. Todashev's death was just one of several. The April 21, 2013, arrest, search, seizure of property, and interrogation was another. Defendant Gagne had already explicitly admitted that Todashev was just a "person of interest" and they had "nothing concrete." There was no probable cause for the warrantless Fourth Amendment searches and seizures that took place on that date. It was the government exercising raw power without apology.

The unjustified seizure by Orange County Deputies at the instance of Defendants was another such example. Once again, Mr. Todashev was placed on the ground at gunpoint. A caravan of SUV's of government agents lined the road behind the arrest.[34] Defendants had been conducting surveillance for weeks.

The Court relies on *Grider v. City of Auburn*, 618 F.3d 1240, 1260 (11th Cir.

---

[34] Doc. 67-5 at 13-14.

2010) to demonstrate Plaintiff's burden to show the denial of some underlying constitutional right. But *Grider* was a case decided on summary judgment, post-discovery, on a completed record. In the instant case, Plaintiff was forced to defend his pleadings without the first stick of discovery. Still, Plaintiff has shown actionable wrongs to support a conspiracy.

Likewise, Plaintiff has made particularized allegations that a conspiracy exists. *Spadaro v. City of Miramar*, 855 F. Supp. 2d 1317, 1346 (S.D. Fla. 2012), *citing Hansel v. All Gone Towing Co.*, 132 F.App'x 308, 309 (11th Cir. 2005).The allegation that the Defendants, Gagne, Cinelli, and Savard, acted in concert to seize Todashev, and to detain him, to ensure there were no witnesses to constitutional abuses, to prevent the discovery of the abuses. These allegations are neither vague nor conclusory. They are tracked by facts that elaborate the allegations. In the plan made by Savard and adopted by the others, Todashev was seized at gunpoint, his apartment searched, he was detained, and interrogated. Through the efforts of all three conspirators, a second seizure occurred May 22, 2013, the night Todashev was killed, involving Savard, Cinelli, and Gagne, met for a common purpose to violate Todashev's rights. In any case, Plaintiff's pleadings contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009).

### 6. Amendment, if Needed, Would Not Have Been Futile

Plaintiff did not seek to amend the Second Amended Complaint because it was not due to be dismissed. Had any discovery whatever been permitted in the case, however, further amendment might have been in order in response to the inevitable twists and turns that come with discovery and testing of evidence. In any case, further amendment would not have been barred as "futile."

Although Plaintiff disagrees that he has not pled a claim to relief that is plausible on its face, he also disagrees (1) he has been responsible for undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendment, (2) nor would amendment cause undue prejudice to the opposing party, (3) nor would it be futile. *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005). In fact, where the government and a host of third parties hold known material evidence just out of sight, including photographs, writings, and recordings, where Plaintiff has been forced to litigate without any discovery at all, it would be premature to assert any of those bars to amendment. Plaintiff fully expected to receive some course correction during discovery as is always the case – except in this case, where discovery simply didn't exist. The Court's impatience with Plaintiff's efforts to plead, citing *Corsello* to the effect that "This is the third complaint that Plaintiff has filed in this action, yet Plaintiff has failed to properly amend [his] complaint . . ." apparently as an indictment of Plaintiff, does not square with the facts of *Corsello* or the famously liberal standards for amendment

in the federal rules. Ironic that if half of what the Defendants suggest are the facts were true, then opening up discovery would dispose of this case on the merits in good order. But the fact is that the Defendants have bitterly fought any disclosure of any evidence with the exception of a couple of interviews from which some redactions were removed just to the extent that it served defense purposes.

In *Corsello*, the plaintiff sought to amend his complaint and the district court denied the motion to amend because (1) Corsello waited a year after the dismissal of one of the defendants to file a motion to file a third amended complaint against the other, and (2) the proposed third amended complaint would not have cured the deficiencies of the second. It should be noted that *Corsello v. Lincare*, 1:98-cv-204, Northern District of Georgia, was first filed January 22, 1998. An amended complaint was filed 18 months later July 14, 1999. A second amended complaint was filed January 13, 2000. A proposed Third Amended Complaint would have been filed more than five years after the action began. 428 F.3d at 1011. The two cases are not apples and oranges, they are watermelons and grapes.

*Stevens v. Gay*, 864 F.2d 113 (11th Cir. 1989) is more of the same. The plaintiff appealed the court's denial of his motion to amend. But the plaintiff failed to move to amend for 16 months after the circuit court reversed and remanded the denial. *Id*. at 116. Like *Corsello*, this is a denial on a motion to amend, where the proposed amendment was unconscionably late and made just shortly before trial. It

should be noted that the court did permit the action to proceed to trial. *Id*. at 113.

## B. The Court's Grant of Summary Judgment to McFarlane Was Improper

As with the Motions to Dismiss, the Court impermissibly weighed evidence and drew inferences for Defendant McFarlane and against the non-moving party.[35]

The Court frequently uses words that carry a connotation that is adverse to the Plaintiff. For instance, the Court cites Plaintiff's Complaint to note Todashev's "association" with Tamerlan Tsarnaev, one of the Boston Marathon bombers. (Doc. 87 at 15). But Plaintiff never spoke of Todashev as an associate of Tsarnaev but that he "trained at a Boston gym with Tsarnaev" (which the Court also quotes after saying that they had an "association." Plaintiff has never alleged Todashev was an associate or friend. Todashev pointedly denounced what Tsarnaev later did. He also noted Todashev trained with the Harvard Wrestling Team.[36] That hardly means they had an "association." It may seem like a small thing, but it is not.

In describing events leading up to the evening of the shooting, (Id.) the Court once again ignored the April 21, 2013, incident in which the Defendants place Todashev down on the ground at gunpoint, search his home, seize his

---

[35] At this point, the Court, in a footnote, states that "While Plaintiff claims to dispute many of these facts, he merely asserts conclusory statements to indicate his disagreement and fails to provide any evidence to demonstrate that a material dispute of fact exists." While Plaintiff disputes this in general, the criticism does serve as a reminder of why it is so important not to be deprived of discovery in the course of a fact-intensive federal lawsuit.

[36] Doc. 67 at 6, citing 67-7, Interview with John Allen, owner of the Wai Kru martial arts gym, Boston, Massachusetts, 5:12-18

electronics, and interrogate him.[37] This incident can't be ignored not only because it is a stand-alone Fourth Amendment violation, but also because it sets the stage for both the unlawful use of deadly force that resulted in Todashev's death.

The Court states that McFarlane "knew" that Todashev had been arrested for a road rage incident but doesn't say how he knew that and whether there was some credible source or a resulting conviction. (Doc. 87 at 15). There is no indication Todashev had ever been convicted of anything. McFarlane apparently wrongly believed Todashev had fought with someone who "lost several teeth" in the fight but the victim said that wasn't so. (Doc. 67-14, Garcia Tr. At 6:13-20). McFarlane "assessed Todashev's "inclination and ability for physical violence" to be eight out of ten. But, in fact, McFarlane's "research" was superficial and mostly wrong.[38] There was no "criminal record" if that is understood to mean convictions.[39]

In shooting cases, law enforcement defendants often freight their reports with dramatic language. The fact that Todashev used the bathroom three or four times in five hours gives McFarlane a "heightened sense of awareness for his and Cinelli's safety." (Doc. 87 at 16, citing Doc. 61-1 at 9, McFarlane Statement). The

---

[37] Doc. 67-3, Tatiana Gruzdeva Affidavit. Cinelli also mentioned being at the contact with Todashev on April 21, 2013. Doc. 67-2 at 6.

[38] The only disinterested witness described the "fight" as Todashev defending himself from an attack. Doc. 67-6, Alli Interview, p. 3:17-21.

[39] "There is nothing particularly vague about the phrase 'prior criminal record;' it would be reasonably clear to any juror of ordinary intelligence that a defendant's prior criminal record consists of his past convictions." *Zant v. Stephens*, 462 U.S. 862, 918 (1983).

Court quotes Cinelli as saying Todashev was moving noticeably slow, almost methodically, making him think Todashev might try to flee or attack him.[40] Nevertheless, minutes later, neither McFarlane or Cinelli were paying any attention to Todashev.[41] The Court says Todashev threw a white table at McFarlane.[42] No one claims to have seen Todashev throw the table.[43] It could have been launched by a quick movement that was not deliberate. Discovery and the efforts of the Plaintiff's forensic experts might answer that question.

Whatever happened, Cinelli stated that he drew his weapon and then put it back in the holster. Apparently, Cinelli did not then believe it was appropriate to use deadly force. In his interview, he has this exchange:[44]

> JA:   Ok, and obviously you did not pull your gun?
>
> CC:   No, I had, I had pulled my weapon and then went back down because he was attempting, ah, my opinion, was attempting to flee out the front door and then that's when I went back down . . .

In discussing the events of the interview, the Court adopts the inference of the Defendants that Todashev's demeanor suggested consciousness of guilt. The Court wrote that he was "very stressed, and it seemed increasingly likely that

---

[40] Id., citing Doc. 61-2 at 4. The Court calls this "continuing erratic behavior." Doc. 87 at 16.
[41] Doc. 61-1 at 10, McFarlane Statement. "I was reading my notepad when I heard a loud noise and suddenly felt a blow to the back of my head. Doc. 61-2 at 5, Cinelli Statement. "As I was looking at my phone I heard a roaring noise, looked up and saw the table between Todashev and SA McFarlane rise up and fly toward SA McFarlane."
[42] Id.
[43] Id.
[44] Doc. 67-2, Cinelli Interview.

Todashev might physically react to the questioning."[45] Taken in context, it seems a justifiable inference that Defendants were goading Todashev with aggressive and insulting questions. At one point, he says, "Don't talk to me like that."[46]

The Court then makes the unduly accusatory statement "Todashev acknowledged his involvement in the Waltham murders and agreed to write a statement."[47] Cinelli does say something almost like that: "Eventually Todashev began to acknowledge some involvement in the Waltham homicides."[48] But McFarlane says something significantly different: "[H]e was going to tell us some information regarding the homicides."[49] These are the kind of inconsistencies that depositions help resolve. It also suggests it would have been helpful if Defendants had turned over the video recordings they had been making that evening.[50]

At the moment of the shooting, the Court admits McFarlane and Cinelli's recollection of the events "diverge somewhat; however. the differences in their recollections are immaterial."[51] Far from it. The moment of the shooting is the key

---

[45] Doc. 87 at 16.
[46] Doc. 67-9 at 5, McFarlane Statement. This statement immediately precedes the language about stress level and possibility of a physical reaction but casts it in a very different light.
[47] Doc. 87 at 16.
[48] Doc. 61-2 at 4.
[49] Doc. 61-1 at 8.
[50] There were apparently a lot of recordings. Cinelli spoke of "observing the video, and from his actions that had been observed." Doc. 67-2 at 6. The State Attorney's investigator mentions that he "watched the videos and the, or the video and the um, listen to the recordings. Doc. 67-2 at 12. Cinelli agrees that he captured some video on a recorder and on his phone. Id. at 13-15.
[51] Doc. 87 at 17.

moment from the standpoint of legal analysis. Cinelli says just before shots are fired, he sees Todashev charging at him with a red pole held over his head with both hands. McFarlane sees him charging "at full speed" but with no weapon. This is important because the red pole is found tucked under Todashev in a way that would be unlikely if he had been holding it with both hands over his head. Also, the red pole bore no viable fingerprints. Add to that the fact that after being shot while charging to the back of the apartment, his body is found next to the front door.[52] Nothing in the statements of either officer explain how Todashev suffered three bullet wounds in his back. The Court's cool dismissal of all the questions that forensic experts spend their whole careers preparing to answer is especially disheartening to a Plaintiff and survivors who have lost a child and badly need those answers – as does the whole institution of justice.

## C. Pre-Discovery Grant of Summary Judgment Is Disfavored

In the course of the Court's Order, it appears that the Court misapprehends the state of discovery when the Magistrate stayed discovery in that the Court states that the Magistrate "entered an Order denying Plaintiff's request for *additional discovery* (emphasis added)." (Doc. 79 at 8). In fact, there had been no discovery produced at all when the stay cut off any responses to Plaintiff's three pending Fed.R.Civ.P. 45 subpoenas to the Orlando Police Department, the Orange County

---

[52] Doc. 67-10 at 4:19-22.

Sheriff's Department, and the Office of the State Attorney, which had conducted an investigation of the shooting.[53]

Defendants claimed to have abundant evidence supporting the necessity of shooting Ibragim Todashev. They had video with audio, photographs, a writing purportedly by Mr. Todashev and purportedly inculpatory, ballistic and blood evidence, among other things. Had the Defendants been forthcoming and had the evidence supported their contentions as they claimed, the case would have been resolved on the merits long ago. This, however, was not their wish.

Summary Judgment motions made prior to adequate discovery are usually premature and hence disfavored. *See, e.g., Americable Int'l Inc. v. Dep't of Navy*, 129 F.3d 1271, 1274 (D.C.Cir.1997); *Tabb v. District of Columbia*, 477 F.Supp.2d 185, 188 n. 1 (D.D.C.2007); *Iacangelo v. Georgetown Univ., Civil Action No. 05–2086*, 2007 WL 915224, at *3 (D.D.C. Mar. 26, 2007). *Bourbeau v. Jonathan Woodner Co*., 600 F. Supp. 2d 1, 3 (D.D.C. 2009); *see also Celotex*, 477 U.S. at 322, 106 S.Ct. 2548 (summary judgment is normally appropriate after "adequate time for discovery"); *Tabb v. District of Columbia*, 477 F.Supp.2d 185, 188 n. 1 (D.D.C.2007) (noting that a pre-discovery summary judgment motion "usually is a

---

[53] The sources from which all parties were litigating, at least at the beginning, were mostly media-supplied records and other publicly-available records that had been highly redacted. Later, the government began to produce less-redacted versions of documents in their possession as the less-redacted documents served the purposes of their arguments. No video or audio and few photographs were produced. Defendant U.S.A. filed one photograph under seal without ever providing a copy to the Plaintiff despite his request. (Doc. 62).

disfavored practice"). Here, the motions for summary judgment were filed prior to full and fair discovery. The question, then, is whether the record now before the Court is sufficient to warrant summary judgment for the Defendants at this stage in the proceedings. *See Thompson v. Fathom Creative, Inc*., 626 F. Supp. 2d 48, 53 (D.D.C. 2009). In order to fully respond to the allegations in the affidavits and other papers of the United States and the other Defendants, Plaintiff was due an opportunity to review and test all the evidence.

### D. Plaintiff Should Have Received Relief under Fed.R.Civ.P. 56(d)

It was well known in this case through waves of motions to dismiss and two motions to stay discovery, and through the pleadings, that ample evidence was claimed by the Defendants to exist that would clearly show the truth of their (albeit contradictory) defenses. Throughout these motions and especially in his response (Doc. 76) to the USA Pre-Discovery Motion for Summary Judgment (Doc. 75), Plaintiff has made broad references to the things that were needed.[54] In the opening sentence of his response, Plaintiff listed the questionable claims that were being advanced by the Defendants "without benefit of discovery." (Doc. 76 at 1).

Defendants revealed just enough self-serving information to bolster their defenses. For instance, in their Motion for Summary Judgment, they produced for

---

[54] It has long been a discovery trick for a responding party to demand the requesting party "list" the records he or she is seeking, rather than rely on broad descriptions of records. Of course it is uniquely within the knowledge of the responding party how their information is kept.

the first time McFarlane's after-action report with only two redactions rather than 75 (Doc. 75-1) (demonstrating that there was no real reason for the other 73). In the response (Doc. 76), Plaintiff highlighted the following discovery problems:

- Redacted NCIC print-outs on Todashev's "criminal history" (Id at 2);

- Names of witnesses that were redacted in reports and interviews (Id.);

- Details of "constant surveillance" set up by Defendant Savard (Id. at 3);

- Apparent absence of warrant for April 21, 2013, seizures (Id. at 4);

- Details of Orange County Sheriff's Department "stage and wait" (Id. at 4);

- Possible drone video surveillance of Todashev (Id. at 4);

- Surveillance video of the mall parking lot altercation (Id. at 5);

- Writing purported to admit "involvement" in Waltham murders (Id. at 6);

- Forensic reports on crime scene and shooting (Id. at 7);

- Tangible evidence for modeling and testing by forensic experts; (Id. at 8).

The Defendant U.S.A. had the duty to demonstrate the absence of a genuine issue of material fact through "discovery and disclosure materials on file and any affidavits." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the U.S.A. was handicapped because there were no such materials on file. In fact, it had to "produce discovery" in a sense, by un-redacting its own document to make a point it thought necessary. (Doc. 75-1).

Plaintiff ultimately made a full presentation under Fed.R.Civ.P. 56(d) in

response to the Motion to Dismiss by Defendant Gagne. (Doc. 86-1). To respond, as the Court has, that the information came at the wrong place and time, is to elevate form over substance at the expense of the preference to resolve cases on the merits. It was never a case of partial discovery or prematurely ended discovery. Because of the stay, Plaintiff never received any discovery whatever at any time.

WHEREFORE, Plaintiff moves this Court grant Plaintiff's Motion to Alter or Amend Judgment in order to prevent a manifest injustice.

Respectfully Submitted,           *s/ James V. Cook*_____
                                  JAMES V. COOK, FBN 0966843
                                  Law Office of James Cook
                                  314 West Jefferson Street
                                  Tallahassee, FL 32301
                                  (850) 222-8080; 561-0836 fax
                                  cookjv@gmail.com

I CERTIFY that I have consulted with counsel for the Defendants, pursuant to Local Rule 3.01(g) and counsel for the Defendants do object to the Motion.

I CERTIFY the foregoing was filed on 9/17/2018, and thereby served on counsel of record registered to be notified by the CM/ECF electronic mail system:

                                  *s/James V. Cook*_____
                                  JAMES V. COOK